2018 IL App (1st) 170733
No. 1-17-0733
Opinion filed September 28, 2018

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| MIGUEL LOPEZ, | ) |
| | ) Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) of Cook County, Illinois, |
| | ) County Department, |
| v. | ) Chancery Division. |
| | ) |
| THOMAS J. DART, Sheriff of Cook County, and | ) No. 15 CH 02264 |
| THE COOK COUNTY SHERIFF'S MERIT | ) |
| BOARD, | ) The Honorable |
| | ) Diane J. Larsen, |
| Defendants-Appellees. | ) Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiff, Miguel Lopez, appeals from the circuit court's order affirming the decision of the Cook County Sheriff's Merit Board (Merit Board) terminating him from his employment as an officer with the Cook County Department of Corrections (CCDOC). The plaintiff argues that because at least one of the Merit Board members who participated in this termination decision was appointed without proper authorization, pursuant to *Taylor v. Dart*, 2017 IL App (1st) 143684-B, the Merit Board's decision was a nullity and void from inception. Accordingly, the plaintiff seeks reinstatement or, in the very least, remand for a hearing before a properly constituted Merit Board. In the alternative, the plaintiff contends that the Merit Board's decision

is against the manifest weight of the evidence and lacking cause. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     The record reveals the following facts and procedural history. The plaintiff was employed as a correctional officer with the CCDOC for more than nine years, beginning on November 1, 2004.

¶ 4     On July 9, 2013, the defendant, Cook County Sheriff Thomas J. Dart (Sheriff), filed a complaint with the Merit Board seeking to remove the plaintiff from employment.

¶ 5     The defendant Merit Board is an administrative body created by statute, and its members are appointed by the Sheriff and approved by the Cook County Board of Commissioners (County Board). 55 ILCS 5/3-7002 (West 2012).

¶ 6     The Sheriff's complaint alleged that between December 29, 2012, and April 13, 2013, without authorization, the plaintiff failed to appear at scheduled work shifts for a total of 96 hours. The complaint further alleged that in February 2012, the Sheriff's Attendance Review Unit (ARU) counseled the plaintiff regarding unauthorized absence and the options available to him to apply for different types of extended leave, which the plaintiff refused. According to the complaint, later in 2012, the Sheriff served the plaintiff with four unauthorized absence disciplinary action forms, a written reprimand and six suspension days, but the absences continued.

¶ 7     The complaint alleged that by his actions, the plaintiff violated the following rules: (1) general order 3.8, which requires employees to obtain proper authorization prior to or immediately after the need for an absence and permits an employee under the collective bargaining agreement who incurs 80 hours of unauthorized absences to be recommended to the

2

Merit Board for termination; (2) Sheriff's order 11.4.1.1, which provides all of the options available to employees to authorize an absence or obtain extended leave if necessary; and (3) article X of the Cook County Sheriff's Department Merit Board Rules and Regulations (Cook County Sheriff's Department Merit Board Rules and Regulations, art. X (eff. Jan. 2008)), which requires that no correctional officer violate any of the general orders, special orders, directives, or rules and regulations of the Sheriff's office.

¶ 8      The plaintiff's complaint was assigned to Merit Board member, John R. Rosales, and Rosales was the hearing officer that presided over the evidentiary hearing in the plaintiff's case. That evidentiary hearing was held on July 17, 2014, and the following relevant evidence was adduced.

¶ 9      Investigator Georgia Garcia from the Sheriff's Office of Professional Review (OPR) testified that in 2012 she was assigned to investigate allegations of unauthorized absences involving the plaintiff. Garcia received a complaint register from the ARU alleging that the plaintiff had accumulated 96 hours of unauthorized absences. She explained that the ARU keeps track of all unauthorized absences and counsels and disciplines employees, up until an employee acquires 80 hours of unauthorized absences. At that point, the matter is forwarded to OPR, pursuant to Sheriff's order 11.4.1.1.

¶ 10      Garcia testified that after receiving the complaint register, she reviewed the plaintiff's attendance records and counseling forms from the ARU and spoke to personnel to confirm the number of unauthorized absences the plaintiff had accumulated. Garcia also interviewed the plaintiff on April 23, 2013, in the presence of a union representative. According to Garcia, during that interview, the plaintiff explained that the 96 hours of absences were due to medication he was taking that made him drowsy. The plaintiff told Garcia that because of this medication he would sleep past the time he needed to call into the Sheriff's medical line to report

his absences. Garcia testified that the plaintiff did not tell her the name his medication or the reason for taking it. The plaintiff also never told Garcia that he had a problem with alcohol dependency. In addition, Garcia stated that during her investigation, she never received any information about the plaintiff's alcoholism from any peer or employee support groups. Based on her investigation, Garcia concluded that the Sheriff's allegations of violations of the general orders were substantiated.

¶ 11    On cross-examination, Garcia acknowledged that in the course of her investigation she did not learn that prior to December 29, 2012, the plaintiff had been on disability leave. She acknowledged that an employee's time sheets only show when an employee is absent and do not reflect if an employee is making an effort to see a Cook County Medical Unit (CC Medical Unit) physician to obtain clearance to return to work after a disability.

¶ 12    Former Sheriff's ARU supervisor Prentiss Jones next testified that he was instrumental in drafting Sheriff's order 11.4.1.1, governing unauthorized absences, disciplinary actions related to such absences, and all options available to employees in achieving authorized attendance status. Jones explained that this order had been created, among other reasons, to address safety concerns in the CCDOC.

¶ 13    According to Jones, under the order, the threshold number of unauthorized hours that would trigger referral to OPR was 80. However, before a complaint register was issued to OPR, the ARU followed a standard procedure. First, for every unauthorized absence of at least one hour that was deemed actionable, an employee would be brought in for counseling. If multiple infractions of the attendance policy continued, the employee would be progressively disciplined and continually reminded not to exceed 80 hours of unauthorized absences. After any disciplinary action, the employee could file a grievance with the legal department, challenging

4

that action. One purpose for the grievance procedure was to protect any medical information that the employee felt uncomfortable disclosing to the ARU and still permit the employee to be placed back into authorized status.

¶ 14     Jones testified that the plaintiff visited the ARU on at least four occasions during which his options for obtaining authorized status were explained. The first such meeting and counseling session occurred on February 24, 2012, during which the plaintiff was provided with an unauthorized absence counseling form and a family medical leave absence (FMLA) packet and advised on obtaining disability. According to Jones, the plaintiff indicated he did not plan on applying for authorized status by checking the box on the counseling form, dating, and signing it.

¶ 15     Jones confirmed that additional counseling meetings with the plaintiff were conducted on February 24, 2012, April 19, 2012, June 20, 2012, and August 14, 2012. These corresponded to disciplinary forms submitted against the plaintiff on April 19, 2012 (for an absent late call on April 14, 2012), June 20, 2012 (for no personal time), and August 10, 2012 (for no holiday time).

¶ 16     Jones acknowledged that the plaintiff filed three grievances with the legal department but that all three were denied with a recommendation for suspension time in order to follow the ARU's progressive discipline procedure.

¶ 17     The deputy director of human resources of CCDOC, Sharon Little, next testified that after her investigation into the matter it was her conclusion that the plaintiff had violated Sheriff's order 11.4.1.1. Little confirmed that the plaintiff was "absent no call" from work on December 29, 2012, and on January 1 through January 10, 2012. She also confirmed that the plaintiff was "absent late call" on February 20, 2012, and March 19, 2013. She explained that this meant that the plaintiff had called in after the one-hour-before-shift requirement. Little testified that these unauthorized absences totaled 96 hours.

5

¶ 18    Little next acknowledged that the plaintiff did apply and was granted disability leave at a later date but testified that this did not negate any part of the 96 hours of previously unauthorized absences that he had accumulated. Little similarly acknowledged that the plaintiff applied for FMLA leave in April 9, 2013, but explained that he was denied this benefit because he had not accumulated the requisite number of hours in his previous year of employment.

¶ 19    Little also testified that she scrutinized the plaintiff's absences after April 2013, which revealed a pattern of abuse. She explained that plaintiff had several unauthorized absences that coincided with regular days off, which meant that the plaintiff was extending his weekends.

¶ 20    Little also confirmed that all employees that reach 40 hours of unauthorized absences are sent a certified letter informing them of their unauthorized status and options available to them to return to authorized status.

¶ 21    After the Sheriff presented its case, the plaintiff testified on his own behalf. He stated that he was currently on disability leave for alcohol dependency. The plaintiff averred that he first realized he had a problem with alcohol dependency in late 2012. As a result in August 2012, he spoke to Michael Goldman from the CCDOC's Employee Assistance Program (EAP). Goldman assesses employees and determines what, if any, treatment he or she needs. Based on their conversation, Goldman recommended that the plaintiff join an outpatient treatment program, and the plaintiff entered such a program between September 5, 2012, and October 22, 2012. The plaintiff suffered a relapse and was hospitalized from October 26, 2012, through November 8, 2012. He reentered intensive outpatient treatment from November 9, 2012, through December 21, 2012.

¶ 22    The plaintiff explained that he was on authorized disability leave while in treatment and that prior to being permitted to return to work he needed clearance from a physician in the CC

Medical Unit. Accordingly, beginning on December 17, 2012, he began calling that unit to schedule an appointment with a county physician.

¶ 23    The plaintiff acknowledged that he did not report to work on December 29, 2012, but stated that he was not aware that his disability had ended the day before. The plaintiff testified that he could not contact the CC Medical Unit to make his appointment on December 29 or December 30 because those dates fell on a weekend. He explained that he waited until Monday, December 31, 2012, to call again, but no one answered the phone. He did not attempt to call on January 1 because he knew it was a holiday.

¶ 24    The plaintiff finally made contact with the CC Medical Unit on January 2, 2013. The plaintiff informed Dr. Manikowski, who was the county physician responsible for clearing him before he could return to work, that he was not feeling well. Dr. Manikowski advised him that he would be excused from any absences so long as she provided him with a note stating that he was under her care for alcoholism. The plaintiff never followed up by calling his employer's medical line to inform them of these intended absences. Instead, the plaintiff admitted, he was absent from work from January 2, 2013, through January 10, 2013, and returned to work on January 11, 2013.

¶ 25    The plaintiff also admitted that he was absent from work on February 20, 2013, March 19, 2013, and April 13, 2013. He explained that on those mornings, he woke up late due to sleep medication he was taking for his alcoholism and therefore had to make absent late calls to work. The plaintiff introduced into evidence a doctor's note indicating that on these dates "patient could not attend to work due to side effect of medication."

¶ 26    The plaintiff acknowledged that since 2012 he has suffered two relapses. He stated that in the spring of 2014 he entered an inpatient treatment program, at the suggestion of EAP. Immediately afterwards, he entered an intensive outpatient treatment program to limit the possibility of

relapse. The plaintiff confirmed that since spring 2014, he has been on disability leave but stated that he intends to return to work once he is cleared by the CC Medical Unit.

¶ 27    On cross-examination, the plaintiff admitted that this was the first time anyone from the Sheriff's department was hearing about his claim of alcohol dependency. Furthermore, he confirmed that on at least five occasions, he was given all options for authorized leave by the ARU but did not take advantage of any them. The plaintiff also acknowledged that ultimately it was his responsibility to remain in authorized status regarding his attendance.

¶ 28    CCDOC Deputy Peter Cozzi next testified that he worked for the CCDOC's Peer Assistance Program, helping correctional officers cope with adverse life situations, including alcoholism. Cozzi testified that after the plaintiff contacted him about his alcoholism, Cozzi had the plaintiff evaluated and placed in an inpatient treatment program. Based on his experience, Cozzi testified that the plaintiff's recovery efforts were genuine.

¶ 29    CCDOC Sergeant Craig Johnson next testified that he was the plaintiff's immediate supervisor for about a year and a half in 2004 and then again for about six months in 2013. Johnson testified that the plaintiff was a good employee who followed direct orders and got along well with fellow coworkers.

¶ 30    On cross-examination, Johnson admitted that he had no information about the plaintiff's unauthorized absences. He also acknowledged that such absences can create security risks, increase overtime costs, and damage the morale of good officers, who are forced to work extra shifts.

¶ 31    On January 15, 2015, the Merit Board issued its decision, terminating the plaintiff's employment as of July 8, 2013. That decision was signed by Rosales and seven other members of the Merit Board. In its decision, the Merit Board found that the plaintiff was absent from

scheduled work shifts which totaled an excess of 80 hours. The Merit Board further found that the Sheriff had proven by preponderance of the evidence that the plaintiff violated each of the "general order[s], Sheriff's order[s] and rules and regulations as set forth in the complaint."

¶ 32     On February 5, 2015, the plaintiff sought administrative review of the Merit Board's decision in the circuit court. On March 3, 2016, the circuit court remanded the cause to the Merit Board asking that the Merit Board "include findings of fact regarding the [plaintiff's] defense of alcoholism" and "refer to the specific rules that were violated and sustained by the Merit Board and not simply refer to the complaint."

¶ 33     No new hearing was held by the Merit Board on remand. Instead, the Merit Board issued its second decision on June 1, 2016, again terminating the plaintiff as of July 8, 2013. This decision was practically identical to the original decision, except that in the findings/conclusions section it clarified that having given "due consideration" to the evidence of the plaintiff's "alcohol dependency or alcoholism," the Merit Board nonetheless found that the Sheriff proved by a preponderance of the evidence that the plaintiff violated "General Order 3.8, Sheriff's Order 11.4.1.1 and Cook County Sheriff's Department Merit Board Rules and Regulations, Article X, Paragraph B."

¶ 34     On August 5, 2016, the plaintiff again sought administrative review of the Merit Board's decision in the circuit court. On February 22, 2017, the circuit court affirmed that decision. The plaintiff now appeals.

¶ 35                                         II. ANALYSIS

¶ 36                         A. The Implications of Rosales's Improper Appointment

¶ 37     On appeal, the plaintiff first asks this court to vacate as void the Merit Board's termination decision on the basis that at least one of the Merit Board members involved in issuing that

decision, Rosales, was improperly appointed.[1] In support, he cites to *Taylor*, 2017 IL App (1st) 143684-B, *appeal denied*, No. 122392 (Ill. Sept. 27, 2017), wherein this appellate court held that Rosales was not lawfully appointed to serve on the Merit Board at the relevant time.

¶ 38    Before addressing the merits of the defendant's contention, however, we must first address the Sheriff's procedural arguments. The Sheriff contends that this issue is waived for purposes of appeal because the plaintiff failed to raise it in a timely manner below, thereby depriving this court of a full record on which to assess his claim. In addition, the Sheriff argues that the *Taylor* decision is not relevant to the issue before us because the final decision issued by the Merit Board, from which the plaintiff now appeals, was never signed by or presided over by Rosales. For the reasons that follow, we disagree.

¶ 39    While it is true that generally issues or defenses not raised before an administrative agency will not be considered for the first time on administrative review (735 ILCS 5/3-110 (West 2012)), our courts have repeatedly held that waiver serves as an admonition on the parties and not a limitation on this court's jurisdiction. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278-79 (1998); see also *Bank of America, N.A. v. Ebro Foods, Inc.*, 409 Ill. App. 3d 704, 709 (2011). It has long been recognized that the waiver rule may be relaxed in order to maintain a uniform body of precedent or where the interests of justice so require. See *Texaco-Cities*, 182 Ill. 2d at 279; *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967); *Caterpillar, Inc. v. Doherty*,

---

[1] In his reply brief the plaintiff alleges that all but one of the Merit Board members involved in his termination were improperly appointed. In support, he attaches a voluminous appendix with documents he claims are responses to his FOIA requests, showing the terms and the dates of appointment for those members. However, since these allegations are raised for the first time in the plaintiff's reply brief and the documents attached are not part of the record on appeal, we are not at liberty to consider them for purposes of this appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (Points not argued in an appellant's brief "are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 534 (2005) ("All matters reviewed on appeal must be made part of the official court record, and a copy of an item attached to a brief cannot be considered by this court.").

299 Ill. App. 3d 338, 346 (1998). Here, we believe that the interests of justice are better served by addressing the issue raised by the plaintiff.

¶ 40    In that respect, we disagree with the Sheriff's position that because Rosales did not sign the Merit Board's post-remand decision, that decision cannot be challenged under *Taylor* at this time. In *Taylor*, the appellate court held that it was not Rosales's signature but rather his "*participation* in the hearing and the decision of the Merit Board" that rendered the actions of the entire Merit Board void. (Emphasis added.) See *Taylor*, 2017 IL App (1st) 143684-B, ¶ 46. In the present case, there was no second hearing held on remand. Rather, the only evidentiary hearing ever held on the plaintiff's case was the one presided over by Rosales. Accordingly, the fact that Rosales was no longer a member of the Merit Board when the subsequent decision was signed does nothing to negate his participation in the proceedings. In fact, it explains why the original and subsequent decisions of the Merit Board are nearly identical.

¶ 41    Accordingly, we reject the Sheriff's invitation to avoid addressing the implications of *Taylor* to the circumstances of this case and instead proceed with the merits of the plaintiff's claim.

¶ 42    In *Taylor*, just as here, the plaintiff challenged his termination by the Merit Board, arguing that the Merit Board was not lawfully constituted because the appointment of one of its members, Rosales, had not complied with section 3-7002 of the Counties Code (Code) (55 ILCS 5/3-7002 (West 2012)). *Taylor*, 2017 IL App (1st) 143684-B, ¶ 10. The circuit court agreed and vacated the Merit Board's decision terminating the plaintiff's employment. *Id.* ¶ 11.

¶ 43    On appeal, the *Taylor* court affirmed the circuit court's decision, noting that section 3-7002 of the Code, creating the Merit Board, requires that members be appointed for staggered six-year terms. *Id.* ¶¶ 21-23. The court in *Taylor* explained that this was in keeping with the statutory goals of "experience and political balance," which would be compromised if the Sheriff were

permitted to appoint members for less than the statutorily provided six-year term. *Id.* ¶ 23. As the court stated:

> "From the plain language of the statute, we glean that the purpose of section 3-7002 is to select individuals to serve on the Merit Board with the goal of achieving an experienced and politically balanced Merit Board. In order to achieve these goals, the statue requires that the members' terms be staggered, insuring that the Merit Board would always contain some experienced members and limiting the number of members from any one political party." *Id.* ¶ 21.

¶ 44    The *Taylor* court further reasoned that because the Sheriff had appointed Rosales in June 2011 to fill a vacancy term that expired in March 2012, this appointment was not for a six-year term and was therefore invalid. *Id.* ¶ 23. The court therefore concluded that the Merit Board was not lawfully constituted at the time the plaintiff's termination decision was made. *Id.* ¶ 46. The court in *Taylor* held that as a result of the improper appointment, the Merit Board's decision was void as a matter of law. *Id.* Accordingly, the court vacated that decision and remanded the matter for a hearing before a new legally constituted Merit Board. *Id.*

¶ 45    The plaintiff on appeal contends that, under *Taylor*, we must find that since Rosales was improperly appointed to the Merit Board when he participated in the decision to terminate the plaintiff's employment, that decision, just like the Merit Board's decision in *Taylor*, was invalid as a matter of law.

¶ 46    The Sheriff, joined by the Merit Board, on the other hand, argues that even if we find that Rosales's appointment was improper we should nonetheless apply the *de facto* officer doctrine to uphold the Merit Board's decision. Specifically, the Sheriff and the Merit Board argue that while the plaintiff in *Taylor* may receive the benefit of being the first to challenge compliance with the

Merit Board appointment statute and have the Merit Board's decision voided, public policy requires that all later challenges be denied so as to prevent the chaos that would result in the invalidation of hundreds of decisions rendered by the same illegally constituted Merit Board. For the reasons that follow, we agree.

¶ 47    The *de facto* officer doctrine is a common law equitable doctrine that "confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Ryder v. United States*, 515 U.S. 177, 180 (1995). In other words, under the doctrine, "a person actually performing the duties of an office under color of title is considered to be an officer *de facto*, and his acts[,] as such officer[,] are valid so far as the public or third parties who have an interest in them are concerned." *Vuagniaux v. Department of Professional Regulation*, 208 Ill. 2d 173, 186-87 (2003) (citing *People ex rel. Chillicothe Township v. Board of Review*, 19 Ill. 2d 424, 426 (1960)).

¶ 48    The doctrine has "feudal origins," dating back as far as the 15th century. See *Andrade v. Lauer*, 729 F.2d 1475, 1496 (D.C. Cir. 1984); see also Note, *The De Facto Officer Doctrine*, 63 Colum. L. Rev. 909, 909 n.1 (1963) ("The first reported case to discuss the concept of *de facto* authority was The Abbe of Fountaine, 9 Hen. VI, at 32(3) (1431)."[2]). However, it has retained its vitality over the years because of its practicality. See *Iowa Farm Bureau Federation v. Environmental Protection Commission*, 850 N.W.2d 403, 423 (Iowa 2014) ("Over time, the doctrine has achieved 'practically universal acceptance by the courts.' [Citation.]"); see also *In re Fichner*, 677 A.2d 201, 205 (N.J. 1996) ("the *de facto* officer doctrine serves the needs of

---

[2]In that case, a convent tried to avoid a bond obligation, claiming the abbot who guaranteed it improperly assumed office after losing the election. Kathryn A. Clokey, Note, *The De Facto Officer Doctrine: The Case for Continued Application*, 85 Colum. L. Rev. 1121, 1125 (1985).

contemporary society" and is "founded on tenets of practicality and convenience in the administration of justice"). Its purpose is to "protect the public's reliance on an officer's authority and to ensure the orderly administration of government." 63C Am. Jur. 2d Public Officers & Employees § 23 (1997). As the United States Supreme Court has explained:

> "The de facto doctrine springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office." (Internal quotation marks omitted.) *Ryder*, 515 U.S. at 180-81.

¶ 49　　Because at its core the doctrine limits the ability of a plaintiff "to challenge governmental action on the ground that the officers taking that action are improperly in office" (*Andrade*, 729 F.2d at 1493-94), the doctrine operates in a way that distinguishes between "direct" and "collateral" attacks on an officer's authority. *SW General, Inc. v. National Labor Relations Board*, 796 F.3d 67, 81 (D.C. Cir. 2015) (citing *Andrade*, 729 F.2d at 1496). A collateral attack challenges "government *action* on the ground that the officials who took the action were improperly in office." (Emphasis in original and internal quotation marks omitted.) *Id.* A direct attack by contrast, challenges "the *qualifications* of the officer rather than the actions taken by the officer." (Emphasis in original and internal quotation marks omitted.) *Id.* Under the traditional *de facto* officer doctrine, only direct attacks are permitted, and must be brought via a *writ of quo warranto*. *Id.*; see also *Vuagniaux*, 208 Ill. 2d at 187 ("Pursuant to the doctrine, litigants may not assert collateral challenges to the officer's qualifications to hold office as a means of contesting the legality of the officer's acts.").

¶ 50    *Quo warranto* proceedings also have "ancient" origins[3] and provide an "extraordinary remedy" by permitting a challenge to a public official who "usurps, intrudes into, or unlawfully holds or executes any office, or franchise, or any office in any corporation created by authority" of the state. 735 ILCS 5/18-101(1) (West 2014); *People ex rel. Wofford v. Brown*, 2017 IL App (1st) 161118, ¶ 13. Such proceedings, however, have been codified in Illinois and must be brought on behalf of the people of the State of Illinois by the attorney general or the state's attorney or, in the alternative, if the state refuses to pursue the action, by an interested party with leave of court. See 735 ILCS 5/18-101 *et seq.* (West 2014); *Wofford*, 2017 IL App (1st) 161118, ¶ 13. The same is true in the federal context. See *SW General*, 796 F.3d at 81 ("To obtain quo warranto against a federal official, an interested party must petition the Attorney General of the United States to institute a proceeding in federal district court. [Citation.] If the Attorney General declines, the interested party can petition the court to issue the writ instead. [Citation.] Both the Attorney General and the court, however, have 'broad discretion' to decline to make use of quo warranto. [Citation.]").

¶ 51    Because of the cumbersomeness of such proceedings, and their potential to deprive a plaintiff with an otherwise legitimate claim of the opportunity to have his case heard, some federal courts have relaxed the *de facto* officer doctrine to permit collateral attacks under specific circumstances. See *SW General*, 796 F.3d at 82-83 (holding that collateral attacks on an official's authority are permissible when the plaintiff brings his action at or around the time that the challenge government action is taken and the plaintiff shows that the agency has had reasonable notice of the claimed defect in the official's title to office). The Illinois Supreme Court, however, has not had the opportunity in recent years to address this issue.

_____

[3]*Quo warranto* proceedings were often used by feudal English kings to force a claimant of an officer or title, supposedly conferred by the crown, to show by what right the claimant held that privilege. 17 Eugene McQuillin, The Law of Municipal Corporations, § 50.02 (3d ed. rev. 1993).

¶ 52    Traditionally, our supreme court was not reticent to apply the doctrine in its original form to validate the acts of otherwise improperly appointed officials, where such acts, rather than the official's qualifications, were challenged in a collateral proceeding. In *Chillicothe Township*, 19 Ill. 2d at 426, the court applied the doctrine to uphold the actions of the county board of review increasing the assessed valuation of the plaintiffs' property. It was stipulated that, based upon the results of the immediately prior general election, the county board of review should have been composed of two Republicans and one Democrat. *Id.* The board, however, was composed of two Democrats and one Republican. *Id.* The plaintiffs argued that because the board was improperly constituted, its actions increasing the assessments were unconstitutional and void. *Id.* Our supreme court rejected the plaintiff's argument holding:

> "Whether the Board of Review was legally constituted or not, the persons acting as such board were performing the duties of the board with apparent right under color of office, and their acts were thus valid as to the public and persons having an interest in them. [Citation.] The Board of Review was thus composed of, at least, *de facto* officers, and from a review of the record and the authorities presented, its acts were apparently valid." *Id.* at 426-27.

¶ 53    A few years later, our supreme court reached a similar conclusion in *People v. O'Neill*, 33 Ill. 2d 184 (1965). In *O'Neill*, the State brought an action against the defendant taxpayer for delinquent personal property taxes. *Id.* The defendant argued that the county board of supervisors was not validly constituted because each township had one supervisor on the board without regard to population, thus violating the "one man, one vote" rule. *Id.* at 185. According to the defendant, because the composition of the board was unconstitutional, its act of levying the personal property tax was illegal. *Id.* The *O'Neill* court rejected the defendant's argument, explaining:

"We think it is clear beyond question that the members of the Peoria County [B]oard of [S]upervisors were at least *de facto* officers within the traditional definition \*\*\*. Their acts in levying, extending and collecting taxes cannot therefore be attacked because of some alleged defect in the apportionment of their membership." *Id.* at 187.

See also *People ex rel. Engle v. Kerner*, 32 Ill. 2d 212, 222-23 (1965) (holding that state senators, although elected from unconstitutionally apportioned districts, were *de facto* officeholders with authority to act); *Cleary v. Chicago Title & Trust Co.*, 4 Ill. 2d 57, 59 (1954) (holding that, even assuming the invalidity of the appointment of appellate court justices, such appointment still conferred color of office, and judgments rendered thereunder were valid and could not be questioned in a mere collateral proceeding); *People ex rel. Hess v. Wheeler*, 353 Ill. 147, 150-51 (1933) ("An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid \*\*\* where he acts under the color of an appointment which is void because he was not eligible to act as such officer, or because of want of power in the appointing body, or by reason of some defect unknown to the public."); *People ex rel. Rusch v. Wortman*, 334 Ill. 298, 301-304 (1928) (holding that an officeholder's eligibility to appointment and the validity of his or her official acts may be challenged only in a "proceeding brought directly for that purpose" (citing *State v. Carroll*, 38 Conn. 449 (Conn. 1871))); *Lavin v. Board of Commissioners*, 245 Ill. 496, 505-06, 92 N.E. 291 (1910) (holding that, without regard to whether the court had authority to appoint defendant a special state's attorney, defendant was at least a *de facto* special state's attorney).

¶ 54    More recently, in 2002, in *Daniels v. Industrial Commission*, 201 Ill. 2d 160 (2002) (plurality opinion), our supreme court addressed the application of the *de facto* officer doctrine in the context of modern jurisprudence. In that case, the court faced a circumstance in which an

17

illegally constituted three-member panel of the Industrial Commission (Commission) issued a decision on review. *Id.* at 161-67. In a plurality opinion, the supreme court vacated the Commission's decision and remanded the matter to the Commission for a decision by a legally constituted panel. *Id.* at 167, 178. The four justices in the majority, however, did not agree on the reasoning underlying their judgment, particularly with respect to the application of the *de facto* officer doctrine.

¶ 55      Chief Justice Harrison, apparently joined by Justice Kilbride, held that the decision in which the two illegally appointed commissioners participated was void and that "[n]o considerations of public policy militate[d] in favor" of applying the *de facto* officer doctrine. *Id.* at 165-67. Justice McMorrow filed a special concurring opinion, in which Justice Freeman joined, holding that, applying equitable principles, the first plaintiff who raised the issue of the validity of the Commission's decision should be granted a new hearing but, in other cases, the *de facto* officer doctrine should apply to maintain the validity of the decisions rendered by the Commission in which the two illegally appointed panel members participated. *Id.* at 175-77 (McMorrow, J., specially concurring, joined by Freeman, J.).

¶ 56      Justice Thomas, in a dissent joined in by Justices Fitzgerald and Garman, held that the Commission's decision was neither void nor subject to collateral attack. *Id.* at 185 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.). Justice Fitzgerald also filed a separate dissent in which he found the two illegally appointed panel members to be *de facto* commissioners with authority to act. *Id.* at 178-79 (Fitzgerald, J., dissenting.).

¶ 57      Although the supreme court's decision in *Daniels* is a plurality opinion, it is clear that five of seven justices agreed with the proposition that the Commission's decision should be upheld using the *de facto* officer doctrine. Justice McMorrow's special concurring opinion in *Daniels*, in

18

which Justice Freeman joined, explicitly stated that "[t]he common law *de facto* officer doctrine operates to prevent invalidation of [otherwise void] decisions." *Id.* at 173 (McMorrow, J., specially concurring, joined by Freeman, J.). Although Justice Thomas's dissent in *Daniels* does not directly address the *de facto* officer doctrine (see *id.* at 181-86, (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.)), his dissent in *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 204-10 (2002), in which Justices Fitzgerald and Garman joined, states that decisions rendered by the two illegally appointed commissioners are either "*de facto* valid" or void; "[t]here is no middle ground." *Id.* at 209 (Thomas, J., dissenting, joined by Fitzgerald and Garman, JJ.).

¶ 58    In the last 15 years since *Daniels*, our supreme court has not had any meaningful opportunity to further analyze the application of the *de facto* officer doctrine. Accordingly, limited as we are, after a thorough review of *Daniels* and *Baggett*, we conclude that application of the *de facto* officer doctrine prevents the invalidation of the Merit Board's decision in this case. In that respect, we agree with the sound reasoning of Justice McMorrow in *Daniels*, that in determining whether to apply the *de facto* officer doctrine, the court must weigh two competing public interests: "the public's interest in promoting the orderly functioning of [government]," and the public's interest in uncovering and exposing "illegal appointment procedures, thereby ensuring that administrative agencies comply with the statutory mandates which govern them." *Daniels*, 201 Ill. 2d at 175-76 (McMorrow, J., specially concurring, joined by Freeman, J.). We further agree with Justice McMorrow that in a collateral proceeding, it is best to draw a line and permit only the first challenger of the improper appointment to invalidate the agency's decision, but no others. *Id.* at 176-77. As Justice McMorrow aptly explained:

"By permitting the claimant who brought the illegal appointments to light to receive a new hearing, the incentive to discover and pursue such illegality is maintained. Once the matter has been litigated and decided by the courts, however, the public interest in uncovering and addressing illegality is served. At that juncture, the public interest in preserving the validity of a large multitude of [the agency's] decisions takes precedence."

*Id.* at 176.

¶ 59    Since the plaintiff in this case is not the first claimant to have brought the illegal appointment of Rosales to light, we conclude that public interest is better served by not invalidating the plaintiff's termination decision. This will circumvent the upheaval that would doubtlessly result if we were to invalidate the Merit Board's decision, and invite hundreds of plaintiffs to seek invalidation of all the decision rendered by the illegally constituted panel during Rosales's unauthorized term.[4] The Merit Board's decisions are not solely limited to disciplinary actions and terminations but rather include promotions and job classifications, all of which could be jeopardized on the basis of Rosales's improper appointment. Accordingly, we apply the *de facto* officer doctrine in this case to find that the decision of the Merit Board as to the plaintiff was valid.

¶ 60    In coming to this decision, we acknowledge that in *Taylor*, the appellate court refused to apply the *de facto* officer doctrine to a plaintiff challenging Rosales's improper appointment. We again reiterate, however, that the plaintiff in *Taylor* was the first to bring to light the improper appointment of Rosales and that, at that juncture, public interest was better served by permitting that improper appointment to be brought to light.

---

[4]In this respect, the Sheriff cites over sixty cases challenging appointments to the Merit Board, which have been filed in the circuit court since the decision in *Taylor* and pursuant to its ruling.

¶ 61        For this same reason we reject the plaintiff's reliance on *Vuagniaux*, 208 Ill. 2d 173, and find that case inapposite. In *Vuagniaux*, the Department of Professional Regulations (Department) brought a complaint against the plaintiff before the Medical Disciplinary Board. *Id.* at 178. While those proceedings were pending, the plaintiff sought the exclusion of one of the board members, arguing that his presence on the board would prejudice him on the basis of the medical theories he practiced. *Id.* at 181-82. The board removed the member to avoid any prejudice and appointed a new member. The plaintiff objected to this new appointment as being in violation of the Medical Practice Act, but that objection went unheeded and the board, with the new member, issued its recommendation. *Id.* at 182. The Department adopted the recommendation of the board. *Id.* at 183. On administrative review, the circuit court set aside the board's decision and dismissed the Department's complaint against the plaintiff, finding, *inter alia*, that the appointment of the new board member was not authorized by law. *Id.* at 183-84.

¶ 62        In affirming that decision, our supreme court rejected the application of the *de facto* officer doctrine on the basis that it did not "involve the effects of an officer's acts on a member of the public or a third party" and that the officer's qualifications to act were "not being contested in a collateral proceeding." *Id.* at 187. Rather,

> "[t]he challenge to [the board member's] authority to act as a member of the Board was raised in the proceeding in which [the board member] was appointed, at the time the appointment was made, by a [plaintiff] whose case was directly affected by the appointment, to the tribunal responsible for considering the disciplinary charges against the [plaintiff], and before the tribunal considered the [plaintiff's] case on the merits or made its recommendations." *Id.*

¶ 63    Unlike *Vuagniaux*, in the present case, the plaintiff never challenged Rosales's authority to act as a member of the Merit Board before the Merit Board and certainly not until after the Merit Board had made its decision. In addition, as already stated above, unlike the plaintiff in *Vuagniaux*, here, the plaintiff is not the first to challenge Rosales's improper appointment.

¶ 64    Since we have determined that the Merit Board's decision is valid, we must next address the plaintiff's contentions regarding the substance of that decision.

¶ 65                              B. The Merit Board's Termination Decision

¶ 66    On appeal, the plaintiff argues that the Merit Board's decision to terminate him was against the manifest weight of the evidence and was not supported by sufficient cause. For the reasons that follow, we disagree.

¶ 67    In an administrative review case, we review the decision of the administrative agency not the circuit court decision. *Frances House, Inc. v. Department of Public Health*, 2015 IL App (1st) 140750, ¶ 22; see also *Marzano v. Cook County Sheriff's Merit Board*, 396 Ill. App. 3d 442, 446 (2009) (citing *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006)). In doing so, we are limited to considering the evidence submitted in the administrative hearing and may not hear additional evidence for or against the agency's decision. *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 66. The standard of review that determines the degree of deference given to an agency's decision depends on the question presented. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50.

¶ 68    " 'Our scope of review of an administrative agency's decision to discharge an employee is a two-step process.' " *Walker v. Dart*, 2015 IL App (1st) 140087, ¶ 39 (quoting *Marzano*, 396 Ill. App. 3d at 446, citing *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105

(1983))). " 'The first step in our analysis is to determine whether the agency's findings of fact are contrary to the manifest weight of the evidence.' " *Id.* (quoting *Marzano*, 396 Ill. App. 3d at 446, citing *Walsh*, 96 Ill. 2d at 105)). " 'The second step in our analysis is to determine if the Merit Board's findings of fact provide a sufficient basis for its conclusion that cause for discharge exists.' " *Id.* (quoting *Marzano*, 396 Ill. App. 3d at 446, citing *Walsh*, 96 Ill. 2d at 105)).

¶ 69    In the present case, contrary to the plaintiff's contentions, we find nothing manifestly erroneous in the Merit Board's finding that the plaintiff violated general order 3.8, Sheriff's order 11.4.1.1 and article X of the Cook County Sheriff's Department Merit Board Rules and Regulations (Cook County Sheriff's Department Merit Board Rules and Regulations, art. X (eff. Jan. 2008)).

¶ 70    An administrative agency's findings and conclusions on questions of fact are considered *prima facie* true and correct. *Beggs*, 2016 IL 120236, ¶ 50 (citing 735 ILCS 5/3-110 (West 2012)). Accordingly, "an agency's factual findings are not to be reweighed by a reviewing court and are to be reversed only if they are against the manifest weight of the evidence." *Id.* Factual determinations are against the manifest weight of the evidence only where "the opposite conclusion is clearly evident." *Id.* Accordingly, "[i]f the record contains evidence to support the agency's decision, we must affirm that decision." *Roman*, 2014 IL App (1st) 123308, ¶ 66. Reversal is not justified merely because the reviewing court would have ruled differently. *Magett v. Cook County Sheriff's Merit Board*, 282 Ill. App. 3d 282, 287 (1996).

¶ 71    The record below incontrovertibly establishes that in a period of less than four months, the plaintiff accumulated 96 hours of unexcused absences. The plaintiff was "absent no call" on December 29, 2012, and January 1 through January 10, 2013. In addition, he was "absent late call" on February 20, and March 20, 2013, and "absent no sick time" on April 13, 2013. The

evidence is further undisputed that the plaintiff was given at least four counseling sessions at which options for extended authorized leave were presented to him but which he consistently failed to utilize. In addition, the record establishes that the plaintiff was aware that his unexcused absences had consequences for his employment. The plaintiff received progressive discipline earlier in 2012, including 6 suspension days before December 29, 2012, as well as a certified letter informing him that he had incurred more than 40 hours of unauthorized absences.

¶ 72    Under this record and contrary to the plaintiff's position, we are unable to find that the Merit Board's factual determinations were against the manifest weight of the evidence. See *O'Sullivan v. Board of Commissioners of the Cook County Board*, 293 Ill. App. 3d 1, 9 (1997) ("If there is evidence in the record that supports the administrative agency's decision, the decision must be sustained on judicial review. [Citation.] Because the weight of the evidence and the credibility of the witness are determined by the agency, there need only be some competent evidence in the record to support the decision.").

¶ 73    In that respect, we disagree with the plaintiff's position that the Merit Board made no specific factual findings regarding plaintiff's defense of alcoholism. The Merit Board's decision detailed the plaintiff's testimony regarding his alcoholism and then explicitly provided that it gave "due consideration" to the evidence offered to show the plaintiff's "alcohol dependency or alcoholism," but determined that regardless of that dependency, the unexcused absences constituted a violation of the relevant agency rules, justifying termination. The plaintiff's contention that the Merit Board was required to make more specific factual findings regarding his alcoholism is unavailing. "The purpose of an agency's findings in an administrative proceeding is to permit orderly and efficient judicial review." *Board of Education of Park Forest Heights School District No. 163 v. State Teacher Certification Board*, 363 Ill. App. 3d 433, 442

24

(2006) Where an agency's findings are sufficient to permit the reviewing court to make an intelligent decision, the standard is met. *Id.* Where, as here, "the testimony before the administrative agency is preserved for review in the record, specific findings of fact by the agency are not necessary for judicial review." *Id.*

¶ 74    The plaintiff next contends that his termination was arbitrary and unreasonable because the record demonstrates that the Merit Board failed to articulate a proper cause for his termination by failing to give sufficient weight to the mitigating evidence of his alcoholism. We disagree.

¶ 75    As already noted above, the second step in our analysis is to determine whether the Merit Board's findings of fact provide a sufficient basis for its conclusion that cause for discharge exists. *Walker*, 2015 IL App (1st) 140087, ¶ 39 (citing *Walsh*, 96 Ill. 2d at 105). Cause is defined as some substantial shortcoming that renders the employee's continued employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his no longer occupying the place. *Walsh*, 96 Ill. 2d at 105. The Merit Board, not the reviewing court, is in the best position to determine the effect of an employee's conduct on the agency. *Marzano*, 396 Ill. App. 3d at 446. Accordingly, considerable deference must be afforded to an administrative finding of cause for discharge and that finding will not be overturned unless it is arbitrary and unreasonable or unrelated to the requirements of the service. *Walsh*, 96 Ill. 2d at 105.

¶ 76    In the present case, there are no rules and regulations of the Merit Board, nor does the plaintiff cite any, which would permit alcohol dependency, even if viewed as an illness, to excuse the plaintiff's unauthorized absences.

¶ 77    In fact, our appellate courts have repeatedly held that a pattern of unexcused absences by a Sheriff's employee, even if caused by a medical condition, is detrimental to service and a basis

for termination. See *Gunia v. Cook County Sheriff's Merit Board*, 211 Ill. App. 3d 761, 773 (1991); *Marzano*, 396 Ill. App. 3d at 447.

¶ 78    In *Guina*, the appellate court reviewing the Merit Board's decision to terminate a correctional officer on the basis of a pattern of unexcused absences and concluded that the "sanction of discharge was not unreasonable, arbitrary or unrelated to the needs of the [Sheriff's] Department." *Gunia*, 211 Ill. App. 3d at 773. In doing so, the court explained that a correctional officer's "excessive pattern of unexcused absences," not only denotes "lack of responsibility and willingness to perform [ ] duties," but also "threatens the penal institution's ability to staff itself and seriously jeopardizes its security." *Id.*

¶ 79    Similarly, in *Marzano*, the appellate court rejected the argument that a correctional officer could not be discharged because her absences were caused by a medical condition. *Marzano*, 396 Ill. App. 3d at 447. Like the plaintiff here, the plaintiff in *Marzano* was discharged because of numerous unexcused absences. *Id.* Like the plaintiff here, she had been counseled and notified of her options to apply for medical or disability leave but did not apply for either. *Id.* Instead, she continued to miss work and was progressively disciplined. *Id.* The court in *Marzano* found that the Sheriff was entitled to fire an employee for excessive unexcused absences and that the plaintiff's continued inability to come to work had a significant impact on the operation of the Sheriff's office. *Id.* Accordingly, the court concluded that the Merit Board's finding of "cause" for discharging the plaintiff was not arbitrary or unreasonable. *Id.*

¶ 80    In doing so, the court in *Marzano* relied on the decision in *Cruz v. Cook County Sheriff's Merit Board*, 394 Ill. App. 3d 337, 342 (2009). In that case, a correctional officer called in sick even though she did not have any accrued sick days. *Id.* The court in *Cruz* held that although the plaintiff provided medical notes for her absences, they were irrelevant "since establishing that

she was actually sick did not negate the fact that she had no more sick days." *Id.* As the court explained, "[i]f an employee has used all his sick days, it is irrelevant that he has a legitimate medical excuse for not attending work, because he is informed at the first (counseling) stage that he may apply for family medical leave or disability leave." *Id.* at 339.

¶ 81    Applying the rationale of *Marzano* and *Guina* to the facts of this case, we similarly conclude that the Merit Board's decision to reject the plaintiff's defense of alcoholism as an excuse for violating the agency's rules regarding unauthorized absenteeism was not made in error. See *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 55 ("An administrative agency 'need not give mitigating evidence such weight that it overcomes its discharge decision, and a discharge in a case where mitigating evidence was presented is not per se arbitrary or unreasonable.' ") (quoting *Malinowski v. Cook County Sheriff's Merit Board*, 395 Ill. App. 3d 317, 323 (2009)). In the present case, former ARU supervisor, Jones, testified that Sheriff's order 11.4.1.1 had been created, among other reasons, to address safety concerns in the CCDOC. In addition, the plaintiff's own witness, Johnson, admitted that unauthorized absences have the potential to create security risks, to increase overtime costs, and to damage morale in the CCDOC. Under this record, the Merit Board's finding of cause for the termination was not arbitrary or unreasonable.

¶ 82    In this respect, we further disagree with the plaintiff's position that the Merit Board failed to give sufficient weight to the plaintiff's testimony regarding his attempts to overcome his alcoholism and the testimony of the witnesses who testified to the genuineness of these efforts. The flaw in this argument is that it asks us to reweigh the evidence presented to the Merit Board, which, as already articulate above, we are not at liberty to do. Regardless of how much sympathy we may have for the plaintiff's struggle, as a reviewing court, we may not reweigh the Merit

27

Board's determination as to the evidence or the credibility of witnesses. See *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 682 (1995) (citing *Doe v. Department of Children & Family Services*, 265 Ill. App. 3d 907, 911 (1994)). "[C]onflicts in testimony revolve around the credibility of the witnesses and are to be resolved by the agency who heard the evidence and observed the witnesses." *Keen v. Police Board*, 73 Ill. App. 3d 65, 71 (1979) (citing *Mobley v. Conlisk*, 59 Ill. App. 3d 1031, 1040 (1978)).

¶ 83                                    III. CONCLUSION

¶ 84      Accordingly, for the aforementioned reasons, we affirm the judgment of the circuit court affirming the Merit Board's decision to terminate the plaintiff from his position as a correctional officer.

¶ 85      Affirmed.