# Illinois Official Reports

## Appellate Court

---

**_Malacina v. Cook County Sheriff's Merit Board_, 2021 IL App (1st) 191893**

---

| | |
|---|---|
| Appellate Court Caption | WALTER MALACINA, Plaintiff-Appellant, v. THE COOK COUNTY SHERIFF'S MERIT BOARD; JAMES P. NALLY; BYRON BRAZIER; GRAY MATEO-HARRIS; JOHN J. DALICANDRO; JENNIFER E. BAE; KIM R. WIDUP; PATRICK BRADY; VINCENT T. WINTERS; and THOMAS J. DART, Sheriff of Cook County, Defendants-Appellees. |
| District & No. | First District, Third Division<br>No. 1-19-1893 |
| Filed<br>Rehearing denied | June 23, 2021<br>July 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2016-CH-15162; the Hon. Celia G. Gamrath, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Christopher Cooper, of Law Offices of Christopher Cooper, Inc., and Lilia M. Malacina, both of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Lyle K. Henretty, Assistant State's Attorney, of counsel), for appellee Cook County Sheriff's Merit Board. |

Stephanie A. Scharf and George D. Sax, of Scharf Banks Marmor LLC, of Chicago, for appellee Thomas J. Dart.

No brief filed for other appellees.

Panel JUSTICE ELLIS delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1 In March 2016, the Cook County sheriff filed disciplinary charges against plaintiff Walter Malacina, a deputy sheriff, before defendant Cook County Sheriff's Merit Board (Board). The Board ultimately decided to terminate Malacina. Malacina then filed a complaint for administrative review in the circuit court. Initially, the circuit court affirmed, finding that the Board's findings were not against the manifest weight of the evidence and that its punishment was not arbitrary or unreasonable.

¶ 2 Malacina moved to reconsider, arguing that the Board's decision was invalid because the composition of the Board was illegal under this court's holding in *Taylor v. Dart*, 2017 IL App (1st) 143684-B, which invalidated a Board decision because one of the Board's members was serving an unauthorized term. Here, Malacina argued, two other members of the Board (Patrick Brady and Gray Mateo-Harris) were likewise serving unauthorized interim terms, and, thus, the Board's adverse decision against him was invalid, too. The circuit court granted reconsideration, found the Board's composition invalid, and remanded for a new hearing before a properly constituted Board.

¶ 3 Those remanded proceedings were stayed, however, on the sheriff's motion and with the consent of Malacina, to await pending decisions from this court in *Lopez v. Dart*, 2018 IL App (1st) 170733, and *Cruz v. Dart*, 2019 IL App (1st) 170915. Those cases ultimately held that later *Taylor* challenges to the composition of the Board were not actionable under the *de facto* officer doctrine, which confers validity on an official's public actions, even though it is later discovered that the official's appointment to public office was deficient. Those decisions relied on the "first challenger" proviso to the *de facto* officer doctrine, such that, while Mr. Taylor was entitled to relief under *Taylor*, any later challengers raising the same claims—such as Lopez and Cruz—were barred by the *de facto* officer doctrine from collaterally attacking completed administrative proceedings. See *Lopez*, 2018 IL App (1st) 170733, ¶ 59; *Cruz*, 2019 IL App (1st) 170915, ¶ 38.

¶ 4 Armed with those decisions, the sheriff returned to the circuit court and asked for reconsideration of its order remanding the case for a new hearing. The sheriff argued that, in light of *Lopez* and *Cruz*, Malacina's challenges to the Board's composition were barred by the *de facto* officer doctrine.

¶ 5     The circuit court agreed. The court reconsidered its judgment once more and ruled in favor of the sheriff on the question of the Board's composition. The court thus reinstated its original judgment in favor of the Board and against Malacina and denied Malacina's motion to amend his complaint.

¶ 6     On appeal, Malacina claims that the circuit court was wrong in its application of the *de facto* officer doctrine; that the court should have allowed him to amend his complaint; that the Board's findings should be reversed; and that the Board violated state law in delaying its disposition of the matter.

¶ 7     We affirm in all respects. The circuit court correctly navigated a shifting body of law and landed properly on denying Malacina's claim regarding the Board composition under the *de facto* officer doctrine. The court did not abuse its discretion in denying leave to amend. The Board's decision was not against the manifest weight of the evidence, and its ultimate discipline was not arbitrary or unreasonable. Nor did the Board violate state law.

¶ 8                                   ANALYSIS
¶ 9                          I. *De Facto* Officer Doctrine
¶ 10    Because we begin with our discussion of Malacina's challenge to the Board's composition and related arguments, we will only outline here the procedural sequence below, reserving for later the substantive discussion of the evidence at the administrative hearing.

¶ 11    On March 18, 2016, Sheriff Dart filed disciplinary charges against Malacina over an incident on the evening of October 11 and the early morning of October 12, 2014, in Alsip, Illinois. In broad strokes, the sheriff claimed that Malacina, a deputy sheriff, committed multiple rule violations in that he left his duty weapon unsecured in his vehicle while drinking inside a bar; drove his car while intoxicated; while driving, narrowly avoided striking three women while they crossed the street and struck one of them in the hand; left his vehicle with his firearm, pointed it at one of the women, and threatened to kill them with impunity, given his status as a law enforcement officer; and did not truthfully respond to later questions about the incident from law enforcement.

¶ 12    In June 2016, the Board began conducting a hearing in Malacina's case. In October 2016, the Board found that Malacina had engaged in the complained-of conduct and that his infractions warranted dismissal. Board members Patrick Brady and Gray Mateo-Harris, both of whom were serving pursuant to interim appointments, participated in and signed the decision to terminate Malacina, as did members John Dalicandro and Vincent Winters.

¶ 13    Malacina filed a complaint for administrative review in circuit court in November, claiming only that the Board's decision was against the manifest weight of the evidence. The court disagreed and upheld the Board's findings.

¶ 14    Malacina then moved for reconsideration, relying on the recent decision in *Taylor*, 2017 IL App (1st) 143684-B, ¶¶ 53, 55, where we held that the Board had been illegally constituted—that is, the appointment of John Rosales to the Board was made in violation of the state law authorizing the appointment. Malacina raised two objections to the composition of the Board: (1) two other members (Mateo-Harris and Brady) were serving improper interim appointments and (2) two additional members (Dalicandro and Winters) were serving nonstaggered terms in violation of state law. Thus, Malacina argued, these improper appointments rendered the Board's decision against him null and void.

¶ 15    Though the circuit court expressed dismay that this argument was raised for the first time in a motion to reconsider, the court nevertheless felt bound by *Taylor* and thus vacated its original judgment and remanded the matter to the Board for a new hearing before a Board that was legally constituted.

¶ 16    Recognizing the pending decisions in *Lopez* and *Cruz*, however, the sheriff moved for a stay of those remanded administrative proceedings before the Board, and Malacina's counsel (at the time) told the hearing officer that Malacina had "no objection" to a stay.

¶ 17    Enter *Lopez* and *Cruz*. As noted, each decision held that, while the first person to challenge the Board's composition (Mr. Taylor of *Taylor v. Dart*) was entitled to relief from the invalid composition, any subsequent challenger to a completed administrative decision by the Board was barred by the *de facto* officer doctrine from raising the same compositional defect. See *Lopez*, 2018 IL App (1st) 170733, ¶ 59; *Cruz*, 2019 IL App (1st) 170915, ¶ 38.

¶ 18    The sheriff then asked the circuit court to once again reconsider its judgment in light of *Lopez* and *Cruz*, arguing that the *de facto* officer doctrine barred Malacina's challenge to a completed Board decision. The circuit court agreed with the sheriff and reinstated its original judgment in the Board's favor. Malacina says this was legal error.

¶ 19    Since the briefing on this appeal was initially completed, both parties called our attention to our supreme court's holding in *Goral v. Dart*, 2020 IL 125085, which indeed contains an authoritative discussion of the *de facto* officer doctrine. Our discussion borrows heavily from that recent decision.

¶ 20    The *de facto* officer rule is a common law equitable doctrine that confers validity on acts performed by an official acting under the color of official title, even though it is later determined that the official's appointment to that position was legally deficient. *Id.* ¶ 71. The point is to avoid the chaos that would result from countless lawsuits challenging prior actions of that official—which could number in the hundreds or thousands—once it is determined that the official's appointment was invalid. *Id.* The need for stability and finality in governmental decisions outweighs the need to correct decisions by that (invalidly appointed) official that were issued months or even years earlier.

¶ 21    But the doctrine was never intended to preclude a *timely* challenge to an official's authority; it is, instead, a defense to a collateral challenge brought *after* the official's action has been completed. *Id.* ¶ 73. So if a litigant challenges that official's authority to act within that very administrative proceeding or contemporaneously with it—that is, *before* a final decision has been rendered—the *de facto* officer doctrine has no application. See *id.* And so it was for Mr. Goral. He challenged the composition of the Board at the time of his administrative hearing in a lawsuit filed in circuit court, not after the Board had rendered its decision. Thus, the *de facto* officer doctrine was no bar to his claim. *Id.* ¶ 75.

¶ 22    The same is not true of Malacina. He did not raise a challenge to the Board's composition at the time of his administrative hearing or at any time before the Board issued its final administrative decision. He did not raise a challenge to the Board's composition until well afterward, in a motion to reconsider the circuit court's judgment on administrative review that upheld the Board's findings. Because he raised the compositional defect after the Board's final administrative decision, the *de facto* officer doctrine applies. See *id.* ¶¶ 73, 75.

¶ 23    As noted, the law, at least as understood in this district of the appellate court, is that the first individual to raise a challenge to an official's authority to act is entitled to relief—a reward

for exposing the defective appointment. See *Lopez*, 2018 IL App (1st) 170733, ¶ 59. The theory is based on Justice McMorrow's concurrence in *Daniels v. Industrial Comm'n*, 201 Ill. 2d 160, 176 (2002) (McMorrow, J., specially concurring, joined by Freeman, J.). The purpose of the "first challenger" exception to the *de facto* officer rule is to incentivize parties to expose illegalities in appointments; if even the first challenger is denied relief, why would anyone bother to raise a challenge in the first place, when they receive nothing for their trouble? And thus an invalidly appointed official might remain invalidly appointed forevermore without consequence. Or so the theory goes. See *Lopez*, 2018 IL App (1st) 170733, ¶¶ 58-59; *Cruz*, 2019 IL App (1st) 170915, ¶ 38.

¶ 24    As the Board notes, it is not clear that the "first challenger" exception has been embraced in the other appellate districts of this state. See, *e.g.*, *People ex rel. Rahn v. Vohra*, 2017 IL App (2d) 160953, ¶ 24 (validating contracts signed by deficient appointee); *Peabody Coal Co. v. Industrial Comm'n*, 349 Ill. App. 3d 1023, 1029 (2004) (Industrial Commission Div.) (upholding commission decision though one of commissioners invalidly appointed).

¶ 25    But even in this district, when invoking the equitable *de facto* officer doctrine, we have taken a narrow view of the "first challenger" exception. For example, in *Cruz*, 2019 IL App (1st) 170915, ¶ 38, we held that a post-decision challenge to the composition of the Board was barred by the *de facto* officer rule, even though Cruz identified different invalidly appointed officials (Gray Mateo-Harris, Kim Widup, and Patrick Brady) than the one identified in *Taylor* (John Rosales) (see *Taylor*, 2017 IL App (1st) 143684-B, ¶ 8).

¶ 26    We noted that the appointment irregularities had been fixed by the General Assembly with a statutory amendment that rendered the appointments of the Board members legal. *Cruz*, 2019 IL App (1st) 170915, ¶ 39; see Pub. Act 100-562, § 5 (eff. Dec. 8, 2017) (amending 55 ILCS 5/3-7002). And we reasoned that Cruz was "challenging the same 'irregularity' in appointment procedures of the Board that has already come to our attention and been addressed," even if the individual Board members at issue there were different. *Cruz*, 2019 IL App (1st) 170915, ¶ 38. We thus declined to relax the equitable doctrine of the *de facto* officer.

¶ 27    Likewise, in *Pietryla v. Dart*, 2019 IL App (1st) 182143, ¶ 18, we held that the *de facto* officer doctrine barred claims that *all* the Board members' appointments were illegal in some respect—including nonstaggered terms, holdover appointments, and excessive terms. Again, we determined that, even if the specific claims raised by Pietryla were slightly different than those of other plaintiffs like Taylor and Cruz, it was appropriate to employ the *de facto* officer doctrine, particularly given the General Assembly's fix of the original problems. We thus could "conceive of no purpose that would be served by allowing Pietryla's challenge to proceed." *Id.*

¶ 28    The same holds true here. Malacina's challenge is not materially different from those of the other plaintiffs. His attack on the Board's composition was specifically directed against Mateo-Harris and Brady, just as in *Cruz*, and his argument about two other members serving nonstaggered terms is no different than in *Pietryla*. And as those decisions noted, any problems in the Board's composition were long ago fixed by the General Assembly. We find no reason to depart from the results in those other decisions.

¶ 29    Malacina relies principally on language from our appellate decision in *Goral v. Dart*, 2019 IL App (1st) 181646, *aff'd*, 2020 IL 125085. There, we noted that the *de facto* officer rule did not bar Goral's claim of a defective Board composition because Goral raised those claims both at the time of his administrative proceedings and in a separate lawsuit while his administrative proceeding was pending, unlike those in cases such as *Cruz* and *Lopez*, where the claims were

raised after the administrative decision had been rendered. See *id.* ¶¶ 97, 99 (noting "significant procedural difference between this case" and *Lopez*, *Cruz*, and others, in that "[i]n each of those decisions, the Sheriff's employee did not challenge the Board's authority until *after* the Board's final decision was issued," whereas Goral and his coplaintiffs "have been raising statutory-authorization arguments before the Board since their cases began, they continue to raise them, and they raised them in this separate lawsuit," all "*before* a final administrative [decision] was rendered" (emphases in original)).

¶ 30　　We also noted that, once the Board is on notice of an illegal appointment, it may not simply proceed onward as if nothing was wrong. That is, if a litigant were to challenge the qualifications of the Board in a *timely* fashion—not after-the-fact but during the proceedings themselves—the law would supply that litigant a remedy. *Id.* ¶ 101 ("The '*de facto* officer' doctrine looks backward. It does not look forward."). We thus summarized, as Malacina also quotes in his brief:

> "To put it plainly: Once *Taylor* was decided, any Sheriff's employee whose case was then-pending before the Board, or who was charged in a new case post-*Taylor*, had every right to challenge the Board's composition for the same reasons as in *Taylor* (or for different reasons). Old cases already finally decided, no, but pending or new administrative cases, yes. Plaintiffs' cases were pending at the time of the *Taylor*, and the '*de facto* officer' doctrine did not prevent them from challenging the Board's composition." *Id.* ¶ 105.

¶ 31　　That statement of the law remains true; it not only survived the supreme court's review of our decision but was the very basis for the supreme court's holding. That is to say, the Board's then-illegal composition remained ripe for a challenge by a party before the Board—*as long as the party raised it at the time of those administrative proceedings*, and not merely afterward, post-final decision. Goral did so, objecting in the administrative proceeding itself on this ground and likewise filing a separate lawsuit—all *before* the Board's final administrative decision was rendered. And that is precisely why the Illinois Supreme Court held that Goral's claim was not subject to a *de facto* officer defense. See *Goral*, 2020 IL 125085, ¶ 75; see also *Pietryla*, 2019 IL App (1st) 182143, ¶ 15 (distinguishing *Goral* in that Goral and coplaintiffs challenged Board's composition while "their disciplinary actions before the Board were pending *** and where no final administrative decision had been rendered at the time of [Goral's] complaint").

¶ 32　　Malacina's claim is barred by the *de facto* officer rule. In other words, it is precluded only because his challenge to the Board appointments was made after the final Board decision was rendered. The circuit court thus properly rejected this challenge.

¶ 33　　　　　　　　　　　　　II. Alleged Violation of 120-Day Rule

¶ 34　　Malacina next claims that an August 2018 amendment to section 3-7012 of the Counties Code, which imposed a 120-day time limit for the Board to render a disciplinary decision following the filing of charges, requires reversal here because his proceeding was not adjudicated within that time window. See 55 ILCS 5/3-7012 (West 2018) ("The Board shall render its decision no later than 120 days following the conclusion of any hearings conducted under this Section.").

¶ 35　　Malacina is pointing here to his second, post-remand administrative hearing, which concluded on April 20, 2018. He says the Board should have rendered its decision within 120

days of that date and did not. The problem for Malacina is that he was not terminated based on the results of that second, remanded hearing. He was terminated based on the results of his *first* hearing that ended in 2016, for which he sought administrative review (and from which he now appeals).

¶ 36     Recall the unusual sequence of procedural events: after the Board entered its final decision in 2016 to terminate him, Malacina sought administrative review. After initially losing, Malacina convinced the court to reconsider in light of *Taylor* and declare those proceedings void. The court thus remanded for a new hearing before a legally constituted Board. But before those proceedings were concluded, down came *Lopez* and *Cruz*, on which the sheriff relied to ask the circuit court to reconsider its judgment once more, this time reinstating its original judgment upholding the Board's decision based on the *de facto* officer rule.

¶ 37     The circuit court agreed and reinstated its original judgment, thus validating the original Board decision from 2016. The court was within its power to do so. Its remand order was an interlocutory order, and the court never lost jurisdiction over the cause. See *Muldrow v. Municipal Officers Electoral Board for the City of Markham*, 2019 IL App (1st) 190345, ¶ 18; *Hooker v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 391 Ill. App. 3d 129, 136 (2009). So nothing stopped the circuit court from reconsidering its interlocutory order. *Kemner v. Monsanto Co.*, 112 Ill. 2d 223, 240 (1986) (interlocutory order may be modified or vacated at any time before final judgment); *RDC Case Creek Trails, LLC v. Metropolitan Airport Authority*, 2020 IL App (3d) 190083, ¶ 17 (same).

¶ 38     Because the circuit court reinstated its original judgment, which upheld the original 2016 Board decision, the later, remanded (and never completed) Board proceedings in 2018 were, by definition, of no effect. So regardless of whether Malacina is correct that the 120-day dispositional deadline in section 3-7012, which first took effect in August 2018, could apply to a hearing that had concluded in April 2018 and was awaiting a final decision—an issue we do not decide—he could not profit from that delay, in any event.

¶ 39                                III. Amendment of Complaint

¶ 40     Malacina next contends that the circuit court erred in not permitting him to amend his complaint on administrative review after the sheriff sought reconsideration under *Lopez* and *Cruz*. We review the ruling for an abuse of discretion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273-74 (1992). Ordinarily, we would review the multi-factor analysis from *Loyola Academy*. See *id.* at 273. But we may begin and end our analysis with the observation that it is never an abuse of discretion to deny leave to amend when the proposed amendment would be futile. *Butler v. BRG Sports, LLC*, 2019 IL App (1st) 180362, ¶ 71; *Nelson v. Quarles & Brady, LLP*, 2013 IL App (1st) 123122, ¶ 69.

¶ 41     Each of the proposed new claims that Malacina hoped to raise, in addition to his original claim that the Board's findings were against the manifest weight of the evidence, were futile. The first sought an order of *mandamus* that the Board had violated the 120-day requirement in section 3-7012, which we have already held would not entitle him to any meaningful relief.

¶ 42     The others all asserted, albeit in different ways, Malacina's *Taylor* objection to the composition of the Board. One was via a declaratory judgment. Another claimed fraud by the sheriff and various Board members for falsely misrepresenting the propriety of the members' appointment to the Board. The final claim sounded in negligent misrepresentation on the same basis. Because the *Taylor* claim was barred by the *de facto* officer rule, as Malacina did not

timely raise it, these related claims were likewise barred. It would undercut the equitable doctrine, indeed, to disallow the claim directly but to allow a clever plaintiff to backdoor the claim under the cover of different legal theories or vehicles. See *Pietryla*, 2019 IL App (1st) 182143, ¶¶ 1, 18 (based on *de facto* officer rule, rejecting similar claims of *mandamus*, declaratory, and other relief challenging legal composition of Board).

¶ 43      Because the claims Malacina sought to raise via amendment would have been futile, the circuit court did not abuse its discretion in denying leave to amend.

¶ 44                               IV. Challenge to Board's Findings

¶ 45      Finally, we reach the original claim made by Malacina on administrative review—that the Board's findings were erroneous, and the discipline imposed improper.

¶ 46                                 A. Summary of Evidence

¶ 47      As noted, Malacina was charged with the violation of various rules and regulations and general orders of the Cook County Department of Corrections, including engaging in off-duty conduct reflecting unfavorably on the sheriff's office, in violation of Sheriff's Order 11.2.20.0, and violating the rules for the off-duty use of service firearms, in violation of Order 09-1.

¶ 48      The complaint stemmed from an incident in Alsip, Illinois, in the late evening of October 11 and early morning of October 12, 2014. The sheriff alleged that Malacina, a deputy sheriff who was then off-duty, (1) operated a vehicle while intoxicated and with his service firearm unsecured inside the vehicle, (2) nearly hit three women on the road (actually striking one in the hand), (3) pointed his service weapon at one of the three women and threatened them before leaving the scene and going home, and (4) failed to answer truthfully when questioned about this incident.

¶ 49      The first witness at the hearing was Kaitlyn Milan (Kaitlyn), who testified that in October 2014, she lived in an apartment at the corner of 117th Street and Pulaski Road in Alsip, Illinois. Sometime after midnight on October 12, 2014, she was hanging out in a car parked on a driveway across the street from her apartment with her roommate, Tiffany Ingram (Tiffany), and Tiffany's sister, Michelle Ingram (Michelle), who lived across the street from Kaitlyn. At some point, Kaitlyn decided to go home, so the three women began to cross the street. As she crossed the street, Kaitlyn suddenly "heard a car screeching down" 117th Street. She turned around and saw a car driving towards the group. According to Kaitlyn, the car "swerved to almost hit us" and "got close enough to where Michelle's hand hit his driver's window." When Michelle's hand contacted the window, the car "slammed" on its brakes, and a man Kaitlyn identified before the Board as Malacina "jumped out" of the car.

¶ 50      When Malacina left the car, Kaitlyn saw him retrieve a gun from the passenger seat. Malacina held the gun up to Michelle's head and said that he "could kill us and get away with it, because he was a cop." Tiffany then stepped in front of Michelle and yelled, "You're going to take five children away from their mother ***." Tiffany then told Malacina, "Do you know who you're talking to? It's us. Get back in your car and go home." (Later in her testimony, Kaitlyn explained that the three women knew Malacina, as Malacina's wife was "best friends with Tiffany and Michelle's mother.") Malacina then began "waving his gun around in his hand." After a "few more things" were said between the two, Malacina got back into his car and "sped off."

¶ 51      Kaitlyn and the Ingram sisters then called the Alsip Police Department and reported "everything" that happened. In addition, because they knew Malacina, they directed the police to his home address. After the police responded, an officer drove the women to Malacina's home. There, each woman identified Malacina. The police then took the three women to the police station to give statements.

¶ 52      On cross-examination, Kaitlyn acknowledged that, in the statement she gave to the police, she did not mention: (1) Malacina pointing a gun at Michelle's head or (2) telling the women that he could kill them and get away with it.

¶ 53      Alsip police officer Benjamin Latham testified that on the morning of October 12, 2014, between 2 and 3 a.m., he received a dispatch reporting that a man had pointed a gun at a woman. Officer Latham then went to 117th Street and Pulaski Road, where he saw three women. Officer Latham spoke to the women, and they all recounted the same story, namely that, after parking their car on the south side of 117th Street, they began to cross to the north side of the street when a vehicle, traveling on Pulaski Road at a high rate of speed, turned onto 117th Street and began "approach[ing] them very quickly." The women explained that they "felt that the vehicle was pretty much going to strike them, was going to hit them," and they noted that one of them "shouted something at the driver." In response, the women told Officer Latham, the driver "stop[ped] his vehicle, got out, and pulled out a handgun and pointed it" at one of the women's head. Thereafter, one of the women told Officer Latham that they knew the driver. The woman then pointed to the driver's home, which was on the same street and visible from the spot where Officer Latham and the women were standing.

¶ 54      Officer Latham then went to the driver's home. Upon arrival, Officer Latham saw a man sitting on a chair outside whom he identified in the hearing as Malacina. According to Officer Latham, "after just a few short words," Malacina asked Officer Latham "if we [was] there in regard[ ] to the incident that happened down the street." After further questioning, Malacina told Officer Latham that he "had already notified his superiors, the Sheriff's Department about the incident." Officer Latham then asked Malacina to describe "what the incident entailed."

¶ 55      According to Officer Latham, "[a]fter many questions," Malacina "agreed" that he turned off of Pulaski Road onto 117th Street and stated that a person struck his car either physically or with an object, so he stopped and "interacted with those people." According to Officer Latham, Malacina further explained that he stopped because "it was a bad neighborhood." Later, when asked whether Malacina gave any details of his encounter with the three women, Officer Latham testified that Malacina corroborated much of the three women's account of the encounter. He explained:

> "Yes, so he said that he stopped his car. It took some prying, usually was after a couple times asking the same question, he would change his answer to corroborate with the three females, the callers, so he would basically allude to, 'No, I didn't threaten anyone. Yes, well, I might have gotten out of my car. Did you have your weapon on you? No, I didn't. Are you sure you didn't? Well, yes, I did,' so the conversation went in that manner, and he eventually corroborated almost the entire story that the female—the victims, the callers had given me."

Officer Latham testified that Malacina did, however, deny pointing his gun at the women and threatening them.

¶ 56      After speaking to Malacina, Officer Latham arrested Malacina and took him to the police station.

- 9 -

¶ 57    Thereafter, Officer Latham was asked whether, based on his experience as an Alsip police officer, he considered the particular block where the incident occurred to be a "bad neighborhood." Officer Latham responded "no." He noted that he had never responded to any felony calls in that block.

¶ 58    Officer Latham then explained that when he was speaking to Malacina, he was "within a foot" of him. Based on his training as a police officer, he observed signs of intoxication in Malacina. Specifically, he noted that Malacina's eyes were "bloodshot and glassy, he was slurring his speech, and his breath had the odor of an intoxicating beverage on it." Based on those factors, Officer Latham believed Malacina was intoxicated.

¶ 59    Georgia Garcia testified that she worked as an investigator with the Cook County Sheriff's Office of Professional Review. Garcia handled the investigation into Malacina's case, which she noted was precipitated by "an arrest report from [the] Alsip Police Department." Garcia explained that to conduct her investigation, she initially reviewed three documents: (1) Malacina's arrest report from the Alsip Police Department, (2) "Sheriff's Orders 11.2.20.0, Article X, which is Rules and Regulations of the Merit Board," and (3) Sheriff's Order 09-1, titled "Securing Department Authorized Firearms," which Garcia explained contained a "safety checklist for storage of your weapons." After reviewing those documents, Garcia interviewed Malacina. The interview was recorded, and a recording of the interview was played during the hearing.

¶ 60    Garcia determined, based on her review of those documents and interview with Malacina, that Malacina violated Sheriff's Order 09-1 and article X of Sheriff's Order 11.2.20.0. Garcia began by explaining that Malacina had a duty weapon issued by the sheriff and was thus required to follow Sheriff's Order 09-1, which provides that:

> "Duty Weapons and Department Issued Weapons are *NOT* to be left in vehicles:
>
>   A. At any time
>   B. In any condition (including dismantled or unloaded firearms)
>   C. Under any circumstance (including lock boxes)." (Emphasis in original.)

Garcia testified that Malacina violated Order 09-1 "[b]y leaving his weapon in his vehicle in his armrest, an armrest of his vehicle" on the night of October 12, 2014.

¶ 61    Garcia testified that Malacina violated Sheriff's Order 11.2.20.0 in numerous ways. Among others, Malacina violated three provisions of section VI.B—sections B.1, B.2, and B.4. She explained that Malacina violated section VI.B.1, which requires sheriff's employees to "[m]aintain a professional demeanor while on duty" and abstain from any off-duty conduct "that would reflect negatively on the [Cook County Sheriff's Office,]" by "not storing his weapon properly" and "having his weapon displayed." That same conduct, Garcia explained, likewise constituted a violation of section VI.B.2, which requires sheriff's employees to refrain from conduct that "discredits the integrity of the [Cook County Sheriff's Office], its employees, the employee him/herself, or which impairs the operations of the [Cook County Sheriff's Office]."

¶ 62    And by virtue of his "behavior," Garcia concluded, Malacina violated section VI.B.4, which bars sheriff's employees from "participat[ing]" in "incidents" that "cause[ ] the [Cook County Sheriff's Office] to be brought into disrepute." Asked to elaborate on what she meant by "behavior," Garcia stated:

"Well, based on my investigation, he consumed alcoholic beverages while being—while having his weapon with him, which is a violation, which everyone is—most employees have, if not all, get a copy of the Sheriff's Order that they have to review, and they have to know.

I believe Deputy Malacina has been with the Sheriff's Department since 1995, and it's a basic rule, you can't have your weapon while you're drinking, while you're drinking, while you're drinking beverages—consuming alcoholic beverages."

¶ 63    Garcia also determined that Malacina violated section VI.D.17, which bars sworn employees from "carry[ing] firearms when there is a likelihood that they will be consuming alcoholic beverages or taking medications which may impair their physical and/or menial capabilities." She likewise determined that Malacina violated section VI.D.18, which prohibits employees from "us[ing], display[ing], or handl[ing] any weapon in a careless, negligent or unlawful manner."

¶ 64    On cross-examination, Garcia testified that she did not interview Officer Latham, Michelle, Tiffany, or Kaitlyn.

¶ 65    Malacina then presented his case in chief. Malacina testified that on the evening of October 11, 2014, he was bowling. He did not have his service weapon at the time. But when Malacina was driving home, he received a call from the bartender of a sportsman's club of which he was a member, reporting that there were "some suspicious people around the premises." Malacina decided to do a premises check, so he drove to his home to retrieve his weapon. After that, Malacina drove to the sportsman's club and saw that it was closed. From there, Malacina went to the Dakota Inn. Upon arrival, Malacina put his service weapon in the armrest of his car. According to Malacina, the gun could not be seen from outside the car. In addition, Malacina noted that he parked in front of the bar and his car was visible from where he was sitting inside.

¶ 66    Malacina acknowledged that he consumed six beers while at the Dakota Inn, but he denied being intoxicated or "impaired in any way." He noted that he lived close to the Dakota Inn, so that if he was impaired, he could have walked home. He stated that he left the bar at "approximately quarter to two."

¶ 67    Malacina testified that after he left the Dakota Inn, he drove home. He explained that he drove north on Pulaski Road and then turned right at 117th Street. According to Malacina, when he turned onto 117th Street, "somebody—something struck [his] car." Malacina stopped the car and got out "with my weapon in my hand." Elaborating, Malacina stated that he was holding his gun in his right hand at the side, "pointing downward." When asked to explain why he left the car with his gun in hand, Malacina stated, "that part of the neighborhood is not really safe and just in case." Malacina denied pointing the gun at anybody. Likewise, he testified that he did not wave the gun around.

¶ 68    According to Malacina, when he emerged from his car, he saw "[t]hree females." Malacina asked one of the women, " 'Why did you hit my car?' " The woman responded, " 'You almost hit us,' " to which Malacina responded, " 'No, I didn't," before turning around and walking back to his car. Malacina denied making any threats to the women. According to Malacina, after the conversation, he got back in his car and drove home. After arriving home, Malacina secured his weapon and then went outside to have a cigarette.

¶ 69    While he was outside smoking, Malacina was approached by an Alsip police officer. The officer asked Malacina if he was " 'just involved in an incident?' " Malacina responded, " 'Are

you talking about the three women down the street?' " Malacina then explained what transpired between himself and the women. The officer arrested Malacina. But the charges against him were resolved by "SOL" (stricken on leave) because the women "never showed up" in court. Thereafter, Malacina's attorney introduced into evidence an Order to Expunge and Impound Criminal Records dated April 7, 2016, as well as a letter from Alsip Police Deputy Chief Jay Miller, which, in Malacina's words, "advised me that the court record is sealed and expunged."

¶ 70    On cross-examination, Malacina was confronted with a document he signed on July 28, 2014, titled "Firearms Home and Range Safety Acknowledgment." That document contained a provision stating, " 'I understand that my duty weapon/alternate weapon must be stored and secured at home when it is not on my person." Malacina conceded that by signing the document, he understood its provisions. However, when asked whether it was his testimony that "between July 28, 2014, and the incident that you forgot it," Malacina stated, "Can't remember everything."

¶ 71    Later, Malacina conceded that nothing prevented him from driving home to secure his weapon after he finished the premises check at the sportsman's club. In addition, Malacina denied living in a bad area. Rather, he testified that a three block stretch of 117th Street beginning at Pulaski Road where the incident occurred and leading up to his home was a "bad neighborhood." However, when pressed to explain why that three block stretch of 117th Street was a bad area, Malacina could only cite "drug dealing," which over a span of 11 years he witnessed happen a "couple [times], I guess." Malacina then testified that his decision to immediately exit his car was a spur-of-the-moment decision, and he conceded that his alcohol consumption "might have" affected his judgment.

¶ 72    Charley Mentz testified that at the time of the hearing, he had worked as a deputy sheriff with the Cook County Sheriff's Office for 21 years and had known Malacina for 20 years. Deputy Mentz testified that he was friends with Malacina. He explained that he "got to know [Malacina] real well" while assigned to Central Warrants because they "rode in a car together for over a year." Deputy Mentz stated that "you want a partner who really brings two things to you, he knows what he's doing, and he doesn't get you in any trouble, and Walter was exceptional in both of those." Deputy Mentz testified that he "ha[d] to thank [Malacina] for the officer that I am today." Deputy Mentz then stated that he believed Malacina was a good employee. When asked what he believed Malacina's reputation to be among other employees, he answered, "I honestly never heard a bad word mentioned about him, and the term you always hear for him is, you know, he's a good guy, Walter is a good guy." On cross-examination, Deputy Mentz testified that he was not present for the incident.

¶ 73    Malacina then presented an affidavit from Colin Luce, the Director of Financial Control for the Cook County Sheriff's Office's Civil Process Unit, to which Malacina was reassigned following the incident. Luce testified that he did not know Malacina before he was assigned to Civil Process, but that in his time there, Malacina had been "a model employee" who "arrives to work on time" and "completes his assignments in an expeditious manner." Luce stated that although he lacked "direct knowledge of the incident that caused Walter to be assigned to Civil Process," he did know that since being assigned to Civil Process, Malacina "has worked very hard, and he has been an asset to the Office of the Sheriff."

¶ 74    On October 20, 2016, the Board issued its decision terminating Malacina. With regard to the competing narratives presented by Kaitlyn and Officer Latham, on the one hand, and Malacina, on the other, the Board found that Malacina's testimony lacked credibility:

"The Board finds by a preponderance of the evidence through the testimony of the witnesses; the audio tape recording of the Respondent's October 20, 2015, interview with OPR (Exhibit 4); and the supporting evidence that the Respondent left his service weapon unattended in his vehicle, while he was in a bar consuming at least six beers, that he drove his vehicle immediately after consuming the six beers; had an encounter with three females in which he pointed his weapon at the females; and was less then credible in his testimony. The Respondent was a 20-year plus veteran of law enforcement who claimed to have a lack of knowledge regarding the Sheriff's orders regarding the consumption of alcohol with his weapon present; leaving the weapon unattended in his vehicle While consuming alcohol; and then driving a motor vehicle in addition to having a weapon present after the consumption of alcohol. The Respondent's claim of a lack of knowledge is unreasonable when considering the Respondent had 20 plus years of law enforcement training from the CCSO and attended consistent re-qualifications with his Service weapon.

The Respondent's version of the events, which lacks credibility, regarding his encounter with the three females, in which he said that he exited his vehicle with his weapon in his right hand, by his side, pointed at the ground—and not in a holster or secured in some other fashion on his person—after consuming any alcohol is troubling, if it were believable. It begs the question as to why was his weapon out in the first place. The Board could only imagine what would have happened had he discharged his weapon during this event after his prior consumption of alcohol. The Respondent could have avoided the entire event had he just continued on home or if he had secured his weapon at home before going to the Dakota Inn and consuming alcohol."

¶ 75                                    B. Analysis

¶ 76        Malacina challenges the findings of misconduct and the penalty imposed. We review the agency's decision, not that of the circuit court. *Porter v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191266, ¶ 63. We review the Board's findings of fact under the manifest-weight standard. *Id.* We will reverse a factual finding only if, "after viewing the evidence in the light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision[,] and an opposite conclusion is clearly evident." *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 67.

¶ 77        The Board was presented with ample, credible evidence establishing that Malacina violated Sheriff's Orders 11.2.20.0 and 09-1. With respect to Sheriff's Order 11.2.20.0, which prohibits off-duty conduct that reflects unfavorably on the Sheriff's Office, Kaitlyn's testimony alone established that Malacina (1) struck Michelle in the hand with his vehicle, (2) exited his vehicle with his gun, (3) approached Kaitlyn and the Ingram sisters while brandishing his weapon, (4) pointed his gun directly at Michelle's forehead, and (5) told her that he could shoot her without repercussion because he was a law enforcement officer. The investigating Alsip police officer testified that Malacina corroborated nearly all of the women's accounts of the incident—with the exception of pointing the gun at Michelle and threatening to kill her, which he has consistently denied.

¶ 78        But the Board found Kaitlyn and the Alsip officer credible and determined that Malacina was not. It is not our job to reweigh credibility decisions; we only ask if the "opposite conclusion" is "clearly evident." *Id.* The opposite conclusion is not clearly evident here. We

are in no position to second-guess the Board's credibility determination, and there was sufficient evidence to support the Board's decision.

¶ 79        At a minimum, it should go without saying—except that this case requires us to state the obvious—that it reflects poorly upon a law enforcement agency when one of its officers, authorized to carry a firearm, handles that firearm while intoxicated and threatens to murder a person while boasting that he could do so with impunity, due to his office.

¶ 80        There was also more than credible evidence that Malacina was intoxicated. He admitted himself that he drank six beers before leaving the Dakota Inn. The way he was driving, as Kaitlyn testified, suggested impaired driving. And the investigating Alsip officer saw the telltale signs of intoxication—not merely the odor of beer but also glassy, bloodshot eyes and slurred speech. That only strengthens the evidence that Malacina violated Sheriff's Order 11.2.20.0.

¶ 81        As noted, Sheriff's Order 09-1 prohibited Malacina from storing his duty weapon in his in his vehicle "[a]t any time," "[i]n any condition," "[u]nder any circumstances"—even in a lock box. Malacina's own testimony established that after he performed the premises check at the Sportsman's Club, he stowed his firearm in the armrest of his vehicle when he went to the Dakota Inn.

¶ 82        We thus have no basis to overturn the findings of the Board. Like the circuit court, we uphold those findings.

¶ 83        Malacina says that we should view this entire incident as a "continuum of force issue," asking whether it was reasonable for Malacina, after his car was struck, to employ the force he did. The problem is that his framing of the issue depends entirely on the premise that Malacina did *not* aim his gun at Michelle's forehead and threaten her—that he merely brought his weapon out of the car as a precaution, given the lateness of the hour, the neighborhood, and his car having been "struck" in some mysterious fashion.

¶ 84        The Board, of course, found otherwise; it adopted the testimony that Malacina pointed his gun at Michelle's forehead and threatened all three women with the firearm. That finding, which we have no basis to overturn, takes the legs out from Malacina's argument. Nobody could argue (nor does Malacina) that the circumstances would have required Malacina to aim his firearm at an unarmed civilian's forehead and threaten the use of deadly force against her and her two friends.

¶ 85        We likewise reject Malacina's suggestion that the Board should have imposed an "alternative disciplinary sanction" short of outright termination. When an employee like Malacina challenges the validity of that sanction, our task is to "determine whether the Merit Board's findings of fact provide a sufficient basis for its conclusion that cause for discharge exists." *Lopez*, 2018 IL App (1st) 170733, ¶ 75.

¶ 86        Our supreme court has long defined "cause" as " 'some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his no[ ] longer occupying the place.' " *Walsh v. Board of Fire & Police Commissioners of the Village of Orland Park*, 96 Ill. 2d 101, 105 (1983) (quoting *Fantozzi v. Board of Fire & Police Commissioners of the Village of Villa Park*, 27 Ill. 2d 357, 360 (1963)).

¶ 87     But "[t]he Merit Board, not the reviewing court, is in the best position to determine the effect of an employee's conduct on the agency." *Lopez*, 2018 IL App (1st) 170733, ¶ 75. And so "[a]n administrative tribunal's finding of 'cause' for discharge commands our respect, and it is to be overturned only if it is arbitrary and unreasonable or unrelated to the requirements of the service." *Walsh*, 96 Ill. 2d at 105.

¶ 88     As stated, the Board was presented with ample, credible evidence establishing, among other things, that Malacina brandished his duty weapon when he confronted Kaitlyn and the Ingram sisters and then boasted that he could kill them without repercussion while pointing his gun at Michelle, all while under the influence of alcohol. The Board could have reasonably determined that the Sheriff should no longer employ a deputy who would leave his gun unsecured in his car while drinking enough beers to be intoxicated, then later brandish that gun, threaten someone's life with it, and claim an unlimited immunity for violating the same laws he was sworn to uphold. At a minimum, we cannot say that the discipline imposed is so arbitrary or unreasonable that we must overturn it. We thus uphold the discipline of termination, as well.

¶ 89                                CONCLUSION

¶ 90     The judgment of the circuit court is affirmed.

¶ 91     Affirmed.