IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Core5 at Route 100, LLC,     :
       Appellant  :
          :
    v.      : No. 57 C.D. 2025
          : Argued: February 3, 2026
Lowhill Township and Lowhill  :
Township Board of Supervisors  :


BEFORE:  HONORABLE RENÉE COHN JUBELIRER, President Judge
      HONORABLE CHRISTINE FIZZANO CANNON, Judge
      HONORABLE STELLA M. TSAI, Judge


OPINION BY
PRESIDENT JUDGE COHN JUBELIRER   FILED:  April 7, 2026


  Can a public official knowingly ignore all statutory procedures for filling a vacancy on the governing body's board, and then make binding decisions in conjunction with the wrongful appointee?  Here, a supervisor vocally opposed to a proposed warehouse in his municipality did not follow the statutorily provided process to fill a vacancy and appointed someone also opposed to the project to serve as fellow supervisor.  After the vote to deny the project, the appointee was removed from office on the basis his appointment did not comply with the law.  Now, the developer whose project was denied by those two supervisors seeks to set aside that denial.  The municipality maintains the vote is valid whether the appointment was proper or not.  There is a well-established doctrine, the *de facto* doctrine, which lends validity to the acts of a person holding public office under color of authority.[1]

---

[1] "A *de facto* officer may be defined as one whose title is not good in law, but who is in fact in an unobstructed possession of an office and discharging its duties in full view of the public, **(Footnote continued on next page…)**

However, the developer here urges the Court to hold that the doctrine does not apply when there is knowledge of the proper procedure but an intentional disregard of it to further a personal agenda. Since the developer raised a timely objection as to the impropriety of the appointment, it asks that the vote of the wrongfully appointed official be voided. Based on established precedent, we agree that the *de facto* doctrine would not shield a deliberate disregard of the known procedure if there is evidence of bad faith, motivation by ill will, personal benefit, or furtherance of one's own agenda provided a timely objection is raised. Confirming the validity of the actions of a rogue public official and the illegal appointee under those circumstances would serve to reward, if not encourage, similar behavior in the future without fear of repercussions. The Court of Common Pleas of Lehigh County (trial court), faced with this issue of first impression, did not make any specific findings as to the supervisors' knowledge and motivation, concluding it was irrelevant to the inquiry. Concluding it is relevant, we vacate the trial court's December 11, 2024 Order and remand for additional factfinding and a new determination under the standard set forth herein.

## I.    BACKGROUND

In this appeal, Core5 at Route 100, LLC (Core5) seeks review of the trial court's Order, which denied Core5 post-trial relief and entered judgment in favor of Lowhill Township (Township) and Lowhill Township Board of Supervisors (Board).[2] On December 22, 2022, Core5 filed a Complaint against the Township

---

in such manner and under such circumstances as not to present the appearance of being an intruder or usurper." *Waite v. City of Santa Cruz*, 184 U.S. 302, 324 (1902).

[2] Core5 separately filed a Petition for Permission to Appeal Pursuant to Pa.R.A.P. 1311 (Petition), which this Court denied on May 2, 2025. *Core5 at Route 100, LLC v. Lowhill Township*
**(Footnote continued on next page…)**

and Board seeking declaratory and mandamus relief related to the Board's November 28, 2022 denial of Core5's Preliminary Land Development and Lot Consolidation Plan (Plan), which sought to build a warehouse within the Township. Specifically, Core5 challenged the legality of the procedure utilized to appoint a new supervisor to fill a vacancy on the Board and that supervisor's authority to subsequently vote to deny the Plan. Core5 also challenged the validity of the new supervisor's vote when it was determined in a separate action in *quo warranto* that the new supervisor's appointment was illegal.

Following a non-jury trial,[3] the trial court found as follows.[4] The Board is comprised of three supervisors. (Trial Court's August 8, 2024 Decision (Decision), Finding of Fact (FOF) ¶ 24.) At the beginning of the relevant time period, the supervisors were Chairman Richard Hughes, Vice-Chairman George "Buddy" Wessner, Jr., and Supervisor Robb Werley. (*Id.* ¶¶ 25.) Hughes served as supervisor for approximately 42 years, and Wesner for approximately 10 years, though he was involved in the Township in some capacity for more than 20 years. (*Id.* ¶¶ 28, 31.)

---

(Pa. Cmwlth., No. 11 C.D. 2025, filed May 2, 2025). The Court concluded that granting the Petition would result in duplicative appeals: one at docket number 11 C.D. 2025 and one at the instant docket number 57 C.D. 2025. Although one count of Core5's Complaint remained pending before the trial court, this Court concluded the December 11, 2024 Order was "an interlocutory order appealable as of right under Pa.R.A.P. 311(a)(8) and *Nationwide Mutual Insurance Co. v. Wickett*, . . . 763 A.2d 813, 815 ([Pa.] 2000." *Id.*

[3] A transcript of the non-jury trial appears in the Reproduced Record beginning at page 96a.

[4] In its brief, the Township and Board take issue with Core5's recitation of the facts in its brief on the basis Core5 cites to facts outside of the trial court's findings. Upon review, we note Core5, the Township, and the Board did so. Because we are serving in an appellate capacity, we are bound by the trial court's findings so long as they are supported by substantial evidence. As no party asserts any finding lacks substantial evidence, we constrain our review to the facts as found by the trial court.

Jill Seymour served as the Township's Secretary since approximately 2011. (*Id.* ¶ 32.)

In October 2021, Core5 submitted its Plan, which was last revised on September 12, 2022. (*Id.* ¶ 34.) One week after Core5 submitted the latest revision to the Plan, Hughes emailed various Township officials stating warehouse development in the Township should be stopped, although Hughes' opinion conflicted with the advice of the Township's solicitor, engineer, and manager.[5] (*Id.* ¶ 36.) Wessner believed he and Hughes had differing opinions on such development, and Seymour "noticed some tension" between Hughes and Wessner because of those differing views. (*Id.* ¶¶ 37, 40.) In late September 2022, the Township's Planning Commission recommended denial of the Plan. (*Id.* ¶ 39.)

At the October 6, 2022 meeting of the Board, Hughes announced that Werley was resigning effective October 7, 2022, but the Board did not vote to accept the resignation.[6] (*Id.* ¶¶ 42-44.) Prior to that meeting, the Township's solicitor also resigned. (*Id.* ¶ 45.) Consequently, the Board had no legal representation at the meeting or through the end of October. (*Id.* ¶ 46.) On October 8, 2022, Hughes emailed Wessner, stating "[C]an you get back to me for an [a]ttorney, [s]upervisor? If not I'll pick them!!!" (*Id.* ¶ 47.) Wessner responded the next day stating he wanted to interview a "few" candidates for both supervisor and solicitor, which he expected Hughes and him to decide in a couple weeks.[7] (*Id.* ¶ 48.) Over the next few days,

---

[5] A copy of the email was admitted as Exhibit P-6 and appears in the Reproduced Record at page 50a.

[6] Minutes from the October 6, 2022 Board meeting were admitted as Exhibit P-2 and appear in the Reproduced Record at pages 32a through 37a.

[7] A copy of Hughes' email and Wessner's emailed response was admitted as Exhibit P-7 and appears in the Reproduced Record at page 51a.

4

Hughes and Wessner exchanged emails disputing what the proper process was to select a solicitor and appoint a supervisor. (*Id.* ¶ 49.)

On October 21, 2022, Seymour emailed Hughes stating Wessner had requested a budget meeting and special meeting be held after the Board's regularly scheduled meeting on November 3, 2022, to enable the soon-to-be-appointed supervisor to attend. (*Id.* ¶ 50.) Hughes responded: "Nope[, the meeting] will be at 4pm like discussed. We will not have a new member because we can't. I'm not agreeing with [Wessner] and he's not agreeing with me[. W]e will have to go before a judge and a hearing for the vacancy board[.[8] S]he doesn't break tie at the meeting. That's funny."[9] (*Id.* ¶ 52.) Minutes before Hughes responded, Wessner emailed Hughes stating he was contacting the Pennsylvania State Association of Township Supervisors (PSATS), of which the Township was a member, seeking advice as to the proper procedure for selecting a new solicitor and appointing a new supervisor.[10] (*Id.* ¶¶ 22, 53.) Wessner also stated that he believed Hughes was running the Township like a dictator. (*Id.* ¶ 53.)

---

[8] A vacancy board is a creature of statute. Section 407(c) of The Second Class Township Code provides

> [t]he vacancy board shall consist of the board of supervisors and one registered elector of the township, who shall be appointed by the board of supervisors at the board's first meeting each calendar year or as soon thereafter as is practical. The appointed elector shall act as the chairperson of the vacancy board.

Act of May 1, 1933, P.L. 103, *as amended*, added by Section 1 of the Act of November 9, 1995, P.L. 350, 53 P.S. § 65407(c).

[9] A copy of Seymour's email and Hughes' emailed response was admitted as Exhibit P-8 and appears in the Reproduced Record at page 52a.

[10] A copy of the email correspondence between Wessner and Hughes was introduced as Exhibit P-9 and appears in the Reproduced Record at pages 53a through 54a.

5

On October 24, 2022, Hughes and Seymour exchanged emails related to advertising upcoming meetings.[11] In one email, Hughes stated "And I don't care what f[******] [Wessner] says[.] I'm the chairman and he has not been accommodating. The mtg. is Thursday 7pm[.] [A]dvertise it!!!!" (*Id.* ¶ 55.) One day later, Hughes emailed Wessner stating, "you are right (if) we can't agree. If we do then as soon as he or she is motioned on and are sworn in they can start. We can fill the vacancy that day or up to 30. That's how I read it." (*Id.* ¶ 56.) Also that day, Seymour and Hughes contacted PSATS for advice related to Werley's resignation and appointing someone to replace him. (*Id.* ¶ 57.) Seymour relayed what she learned from PSATS to Hughes.[12] (*Id.* ¶ 58.) Seymour contemplated quitting as Secretary because she was concerned about the proper procedure being followed. (*Id.* ¶ 59.)

On October 28, 2022, Seymour emailed Hughes and Wessner the unapproved minutes from the Board's October meeting and an agenda for its upcoming November meeting.[13] (*Id.* ¶ 60.) In the email, Seymour stated that the agenda did not include any warehouses or other items that might require legal advice and that "Core5 will have a special meeting at the end of November, date to be determined at our [B]oard meeting. Possibly November 28, 29, 30." (*Id.*)

On November 1, 2022, Wessner informed Hughes that the Board would need to pick a supervisor at the November 3, 2022 meeting because he would be unavailable until the end of November, though he could attend virtual meetings at

---

[11] A copy of the email correspondence between Hughes and Seymour was introduced as Exhibit P-10 and appears in the Reproduced Record at pages 55a through 57a.

[12] Copies of the various emails on October 25, 2022, were introduced as Exhibit P-11 and appear in the Reproduced Record at pages 58a through 64a.

[13] A copy of this email was introduced as Exhibit P-12 and appears in the Reproduced Record at page 65a.

various times or an in-person meeting on November 30, 2022, which was the last date to review Core5's Plan, as the deadline had been extended seven times already. (*Id.* ¶¶ 61-63.) Several Township officials asked for another extension but Core5's counsel indicated that he did not have authority to approve an extension. (*Id.* ¶ 64.) At the November 3, 2022 regularly scheduled meeting, Hughes and Wessner voted to accept Werley's resignation.[14] (*Id.* ¶ 65.) Also at that meeting, Hughes and Wessner separately moved to appoint someone to fill the vacant supervisor seat, but each motion failed for lack of a second, so no supervisor was appointed. (*Id.* ¶ 66.) Hughes announced a Vacancy Board meeting would be scheduled for November 10, 2022, but no motion or vote to that effect was made. (*Id.* ¶ 67.) Hughes also announced that the Board would hold a special meeting on November 28, 2022 to review the Plan. (*Id.* ¶ 68.) Wessner wanted to try to "hash" out who the new supervisor would be in a sit-down with Hughes, but did not believe Hughes would want to do so. (*Id.* ¶ 69.) Hughes did not believe their differences could be "hashed" out due to the deadlock. (*Id.* ¶ 70.)

On November 4, 2022, Wessner emailed Hughes stating, "For the record, I was never asked if we could have an early vacancy board meeting and I did not agree to your meeting."[15] (*Id.* ¶ 71.) Wessner was unaware of the Vacancy Board meeting until Hughes made the announcement at the November 3, 2022 meeting. (*Id.* ¶ 72.) On November 5, 2022, Hughes emailed Seymour with instructions to forward resumes for the Vacancy Board meeting to him and Carol Betz, who was chair of the Vacancy Board. (*Id.* ¶ 73.) Hughes also stated that the Vacancy Board would

---

[14] Minutes from the November 3, 2022 Board meeting were admitted as Exhibit P-3 and appear in the Reproduced Record at pages 38a through 39a.

[15] A copy of this email was introduced as Exhibit P-13 and appears in the Reproduced Record at pages 66a through 67a.

meet at 7 p.m. to appoint a new supervisor and the Board would meet at 7:30 p.m. to discuss a new solicitor. (*Id.* ¶ 74.) Seymour responded on November 7, 2022, that the Vacancy Board meeting was not properly scheduled and the meeting could not occur in Wessner's absence.[16] (*Id.* ¶ 75.) Hughes testified that he believed the Vacancy Board meeting was proper as it was scheduled more than 30 days after the effective date listed in Werley's resignation letter. (*Id.* ¶ 76.)

In the interim, on November 4, 2022, Curtis Dietrich expressed an interest in the open supervisor seat. (*Id.* ¶ 77.) The prior month, Dietrich, who belonged to a citizen's group, sought advice from the group's attorney about vacancy board procedures, *quo warranto* actions, and the *de facto* doctrine. (*Id.* ¶ 79.) According to Dietrich, he wanted this information "to help him decide whether putting himself forward as a candidate for the vacant supervisor seat was worth his time." (*Id.* ¶ 80.) "Wessner called [] Dietrich to see if he would be a good supervisor and to make him aware of the Vacancy Board procedures." (*Id.* ¶ 81.) On November 10, 2022, approximately seven hours before the Vacancy Board meeting, Wessner sent Dietrich a photograph of the Vacancy Board procedures because, in Wessner's opinion, the Vacancy Board meeting scheduled for that evening was not legal.[17] (*Id.* ¶ 82.) Based on his interaction with Dietrich, Wessner did not believe Dietrich was a good candidate for the supervisor vacancy because "Dietrich only cared about opposing warehouse development projects." (*Id.* ¶ 83.)

---

[16] A copy of the email correspondence between Seymour and Hughes was introduced as Exhibit P-14 and appears in the Reproduced Record at page 68a.

[17] A copy of the text message, which included the photograph, was introduced as Exhibit P-15 and appears in the Reproduced Record at pages 69a through 70a.

8

At the November 10, 2022 Vacancy Board meeting, only Hughes and Betz attended and appointed Dietrich to fill the vacancy supervisor seat.[18] (*Id.* ¶¶ 84, 86.) Dietrich was sworn in at the meeting by a magisterial district judge who Hughes arranged to attend for that purpose. (*Id.* ¶ 87.) Had the Vacancy Board met between December 3 and December 18, 2022, Wessner would have been able to attend. (*Id.* ¶ 93.)

At the special Board meeting on November 28, 2022, which Wessner did not attend, Hughes and Deitrich voted to deny Core5's Plan.[19] (*Id.* ¶¶ 88-89.) Prior to the vote, counsel for Core5 lodged an objection to the special meeting on the grounds it was illegal for lack of quorum and it violated both The Second Class Township Code (Township Code)[20] and the Pennsylvania Municipalities Planning Code (MPC).[21] (*Id.* ¶ 91.) Hughes and Dietrich asked Core5 to grant the Board an extension of time to review its Plan, but Core5's counsel indicated neither he nor Core5's Vice President of Investments, who was also in attendance, had the authority to do so given the deadline had already been extended seven times. (*Id.* ¶ 92.)

The Board's next regularly scheduled meeting was December 1, 2022, which Wessner attended. (*Id.* ¶ 93.) The Lehigh County District Attorney filed a *quo warranto* action seeking to remove Dietrich from the supervisor position on March 7, 2023. (*Id.* ¶ 94.) On June 13, 2023, Dietrich was removed from office.[22] (*Id.*

---

[18] Minutes from the November 10, 2022 Vacancy Board meeting were admitted as Exhibit P-4 and appear in the Reproduced Record at pages 40a through 41a.

[19] Minutes from the November 28, 2022 special meeting were admitted as Exhibit P-5 and appear in the Reproduced Record at pages 42a through 49a.

[20] Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§ 65101-68701.

[21] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

[22] A copy of the order and accompanying decision removing Dietrich from the supervisor position, as well as the stipulated exhibits from the *quo warranto* action, were introduced as Exhibit P-16 and appear in the Reproduced Record at pages 71a through 93a.

¶ 95.)  One week later, another Lehigh County Court of Common Pleas judge granted Betz's petition to appoint Dietrich to the newly vacant supervisor position.[23] (*Id.* ¶ 96.)  Dietrich was elected as supervisor at the general election on November 7, 2023.  (*Id.* ¶ 97.)

Based upon the above facts, and upon consideration of the parties' arguments, the trial court found in favor of the Township and Board, concluding, after an extensive review of Pennsylvania jurisprudence, that the *de facto* doctrine prevented it from granting Core5 any relief.  The trial court stated, "[u]ndoubtedly, [the] Township and the Board . . . engaged in a series of missteps in [the] Township between October 6, 2022 and November 28, 2022."  (Decision at 27.)  It found that, despite the parties' focus on the supervisors' motivation, "such motivations are irrelevant to the key question before [the trial c]ourt, that is whether the vote taken by [] Hughes and [] Dietrich on November 28, 2022 to deny Core5's Plan was valid and legally effective."  (*Id.*)

The trial court explained that although Werley's resignation was announced at the October 6, 2022 meeting, it was not until the Board voted and approved the resignation on November 3, 2022, that the resignation became legally effective under Section 407(b) of the Township Code, 53 P.S. § 65407(b).[24]  (Decision at 29-

---

[23] A copy of this order was introduced as Exhibit P-17 and appears in the Reproduced Record at pages 94a through 95a.

[24] Section 407(b) provides:

(b) A resignation:

(1) Shall not create a vacancy until the date that the resignation is accepted by a majority vote of the board of supervisors at a public meeting or the effective date of the tendered resignation, whichever is later.  The board of supervisors must accept a tendered resignation no later than forty-five days after the

**(Footnote continued on next page…)**

30.) Therefore, under Section 407(c), the trial court reasoned, Hughes' convening of the Vacancy Board meeting on November 10, 2022, was premature because it occurred sooner than the 31st day after the resignation became legally effective.[25] (*Id.* at 31.) According to the trial court, it was on this basis that the *quo warranto* action was granted and Dietrich ousted. (*Id.*)

The trial court explained:

> Even though [] Dietrich's appointment to the Board . . . on November 10, 2022[,] did not comply with Section []407 of the . . . Township Code, his official actions between November 10, 2022[,] and June 13, 2023 – the date of his ouster – are legally binding on the public and protected from collateral attack by application of the *de facto* doctrine. To hold otherwise would not only undo the vote on Core5's Plan, but also call into question every other action that [] Dietrich took from November 28, 2022[,] until the date of his ouster on June 13, 2023. Such an outcome would be wholly inconsistent with the purpose of the *de facto* doctrine to promote the orderly and continuous functioning of government despite technical defects in title to office. . . .
>
> However[] irregular, improper, or illegal [] Dietrich's appointment at the premature Vacancy Board meeting was, his vote on November 28, 2022 was cast under color of title to the office of [] Township Supervisor. . . . [] Dietrich did not take the vacant supervisor seat by force or threat. He did not walk into the Board . . . meeting, sit down at the head of the table, and say "I'm in charge now." [] Dietrich was not a usurper or mere volunteer. Even if [] Hughes suspected, believed, or knew that he was calling the Vacancy Board prematurely and even if [] Dietrich had heard about *quo warranto* actions and the *de facto*

resignation has been tendered to the board of supervisors, unless the resignation is withdrawn in writing prior to acceptance.

(2) That is not accepted as under paragraph (1) shall be deemed accepted forty-five days after the resignation has been tendered to the board of supervisors.

53 P.S. § 65407(b).
    [25] The Township Code provides that "[i]f for any reason, the board of supervisors refuses, fails, neglects or is unable to fill a vacancy within thirty days after the vacancy occurs, . . . the vacancy shall be filled within fifteen additional days by the vacancy board." 53 P.S. § 407(c).

11

doctrine prior to putting his name forward as a candidate for the role of supervisor, that does not transform [] Dietrich into a usurper. Application of the *de facto* doctrine does not depend on subjective criterion. Instead, it focuses on the objective determination of whether the individual's authority is "'derived' from an election or appointment, however irregular or informal." [*Com. ex rel.*] *Palermo* [*v. City of Pittsburgh*], 13 A.2d [24,] 26 [(Pa. 1940)] (citing *In re Krickbaum's Contested Election*, 70 A. 852, 854 (Pa. 1908)) (emphasis added).

Here, [] Dietrich was a qualified citizen of [the] Township, who put his name forward to fill a vacancy. [] Dietrich was appointed at a public meeting of the Vacancy Board, after the unanimous vote of [] Hughes and . . . Betz. Immediately thereafter Magisterial District Judge Tom Creighton administered the oath of office to [] Dietrich. From that moment, in the eyes of the public, [] Dietrich appeared to be a properly seated supervisor. And from November 10, 2022[,] through June 13, 2023[,] [] Dietrich openly and notoriously held himself out as a [] Township Supervisor.

(*Id.* at 31-32.) The trial court suggested confusion as to the effective date of the resignation and the procedure to be followed to fill a vacancy attributed to the "timing misstep," which it said was "technical in nature." (*Id.* at 32-33.)

The trial court declined Core5's request to examine other jurisdictions' caselaw related to the *de facto* doctrine, stating it saw "no reasons to expand the bounds of the *de facto* doctrine beyond that which has already been articulated in this Commonwealth." (*Id.* at 33.)

Because Deitrich's actions were entitled to *de facto* validity, the trial court concluded the Board timely acted upon Core5's Plan and Core5 was, therefore, not entitled to a deemed approval. (*Id.* at 34.)

12

Core5 filed a timely sought post-trial relief, which the trial court denied and entered judgment in favor of the Township and Board. Core5 then filed a timely notice of appeal.[26]

## II.   PARTIES' ARGUMENTS

On appeal, Core5 proffers numerous reasons that the trial court erred or abused its discretion in applying the *de facto* doctrine under this set of facts.[27]   It asserts that the *de facto* doctrine provides "validity to the acts of public officials who are properly appointed or elected but for minor, technical defects in title," whereas here there was "willful disobedience" and "seizure of the powers of government" by one supervisor (Hughes). (Core5's Brief (Br.) at 17.) Core5 does not contest that, under the right circumstances, the *de facto* doctrine serves a legitimate purpose – the consistent and orderly operation of government. However, it asserts the *de facto* doctrine should not apply in situations such as this where there is knowledge that the actions were not proper or in good faith. Citing precedent from the United States Supreme Court, Core5 argues Deitrich is what is called a "usurper," and his actions have no effect. (*Id.* at 19 (citing *Tweed's Case*, 83 U.S. 504 (1872)).)

Although Core5 recognizes that there is a dearth of caselaw in Pennsylvania as to what effect, if any, knowledge or bad faith has on the applicability of the *de facto* doctrine, it urges the Court to adopt the reasoning of other jurisdictions and hold that the *de facto* doctrine does not apply whether there is knowledge of a defect in title or a lack of good faith. Here, Core5 claims there is ample evidence of

---

[26] The trial court directed Core5 to file a statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b), which Core5 did. In its opinion issued pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court adopted its prior reasoning.

[27] As many of Core5's arguments overlap, we have combined and reordered Core5's arguments for ease of discuss.

knowledge and/or bad faith based upon Hughes' and Deitrich's own statements and actions. In addition, Wessner raised objections, as did Core5's counsel at the meeting **before** the vote on the Plan. Yet Hughes and Deitrich proceeded to vote and deny the Plan.

Core5 argues the Vacancy Board meeting, at which Deitrich was appointed, lacked quorum of the supervisors and violated the Township Code. Core5 posits only the Board can act on behalf of the Township, and in the event the majority of the remaining Board members cannot fill the vacancy, the Vacancy Board, comprised of the remaining Board members and a registered elector appointed by the Board at its annual reorganization meeting, can fill the vacancy. Since Wessner did not participate in the illegally called Vacancy Board meeting, Core5 argues the Vacancy Board lacked quorum and could not take official action. In Core5's view, Hughes acted as a "dictator" when the Township Code requires Board quorum and action. (Core5's Br. at 32.) Moreover, the Vacancy Board meeting was inappropriate, according to Core5, because it was held before the statutory time period in which it could fill the vacancy. Core5 argues applying the *de facto* doctrine under these circumstances renders the Second-Class Township Code superfluous and enables one supervisor to exert unilateral control over the Township.

Accordingly, Core5 asks the Court to reverse the trial court's Order and conclude that, because the Board did not timely act on the Plan, it should be deemed approved.[28]

---

[28] Section 508 of the MPC provides, in pertinent part:

> All applications for approval of a plat . . . , whether preliminary or final, shall be acted upon by the governing body or the planning agency within such time limits as may be fixed in the subdivision and land development ordinance but the governing body or the planning agency shall render its decision and communicate

**(Footnote continued on next page…)**

14

The Township and Board argue the trial court properly applied the *de facto* doctrine and Core5's arguments "completely ignore[] the rationale for the doctrine[] and decades of consistent application in Pennsylvania." (Township & Board's Br. at 5.) They claim nowhere have Pennsylvania courts limited application of the *de facto* doctrine to situations where there was a minor, technical defect. To interpret it as Core5 seeks would, in the Township's and Board's view, undermine the doctrine's purpose in promoting the orderly operation of government. Notwithstanding the Township's and Board's view that there is no limitation on the *de facto* doctrine's application, they argue the defect here, the premature appointment of Deitrich, was a minor, technical error. They dispute that the Vacancy Board lacked quorum to appoint Deitrich, and argue that even if Wessner had attended the Vacancy Board meeting, Dietrich would still have been appointed by a 2-1 vote.

it to the applicant not later than 90 days following the date of the regular meeting of the governing body or the planning agency (whichever first reviews the application) next following the date the application is filed or after a final order of court remanding an application, provided that should the said next regular meeting occur more than 30 days following the filing of the application or the final order of the court, the said 90-day period shall be measured from the 30th day following the day the application has been filed.

. . . .

(3) Failure of the governing body or agency to render a decision and communicate it to the applicant within the time and in the manner required herein shall be deemed an approval of the application in terms as presented unless the applicant has agreed in writing to an extension of time or change in the prescribed manner of presentation of communication of the decision, in which case, failure to meet the extended time or change in manner of presentation of communication shall have like effect.

53 P.S. § 10508.

15

The Township and Board also assert that Core5's objection at the Board meeting where the Plan was denied "ignores the obvious and convenient fact that had the Board not taken action at that meeting, Core5 would have been entitled to a deemed approval." (*Id.* at 8.) For this reason, Dietrich requested an extension, which Core5 refused. The Township and Board assert the testimony of Core5's representative that deemed approval was not a consideration is not credible. They argue curing any alleged defect was not possible within the two days remaining for the Board to act on the Plan because the third supervisor, Wessner, was unavailable.

The Township and Board posit that the trial court properly applied the *de facto* doctrine and asks the Court to affirm the trial court's Order.

## III. DISCUSSION

Central to this appeal is the *de facto* doctrine, an equitable principle that has been applied in the Commonwealth for more than two centuries. It appears the Pennsylvania Supreme Court first recognized the doctrine in *Riddle v. County of Bedford*, 7 Serg. & Rawle 386 (Pa. 1821). There, the Supreme Court held, among other things, that county treasurers had to take the constitutional oath of office, which raised the question of the validity of their acts when they did not. The Supreme Court considered decisions from other jurisdictions that recognized the doctrine. *Id.* at 392-93. It observed that those courts drew a distinction between acts for strangers or the public, which were valid, and acts for oneself, which were void. *Id.* at 392.

In *Keyser v. M'Kissan*, 2 Rawle 139 (Pa. 1828), the Supreme Court elaborated on the principle. There, two county commissioners had not taken the constitutionally required oath of office, and it was asserted that the bond issued by the treasurer, who was appointed by the commissioners, was void. The Supreme Court concluded the

16

commissioners "were officers *de facto*, since they came into their office, by colour of title." *Id.* at 140. Citing a decision by the Supreme Court of New York, our high court stated "[i]t is a well settled principle of law, that the acts of such persons are valid when they concern the public, or the rights of third persons, who have an interest in the act done." *Id.* (emphasis omitted). The Supreme Court explained "this rule has been adopted to prevent a failure of justice." *Id.* However, the Supreme Court also drew the distinction first drawn in *Riddle* when the benefit is for the *de facto* official's own benefit. It held "[t]hat the act of an officer *de facto*, where it is for his own benefit, is void; because, he shall not take advantage of his own want of title, which he must be conusant of." *Id.* (citation omitted). However, the Supreme Court continued, "where it is for the benefit of strangers, or the public, who are presumed to be ignorant of such defect of title, it is good." *Id.* (citation omitted).

The Supreme Court had occasion to revisit the doctrine again in *Commonwealth ex rel. Raker v. Snyder*, 144 A. 748 (Pa. 1929). There, the appellee was appointed to fill a vacancy after the elected township treasurer died. A writ of *quo warranto* was issued challenging the appellee's appointment on the basis that one of the township commissioners who voted to appoint him wrongfully held that office. It was alleged that the commissioner had not paid state and county taxes, and consequently, the commissioner could not hold office, and, as a result, his vote to appoint, which was needed to obtain a majority vote, was invalid. The Supreme Court concluded the *de facto* doctrine applied, explaining that, to hold otherwise, would create confusion. *Id.* at 749. In *Raker*, there were allegations that the appellee's appointment should be void because it involved fraud, conspiracy, bribery, and corrupt solicitation. *Id.* at 750. The Supreme Court acknowledged that "there were suspicious circumstances testified to," but, consistent with appellate

17

review, it deferred to the common pleas court's findings as to the facts, credibility, and weight of the evidence, as they were supported by substantial evidence. *Id.*

In *Commonwealth ex rel. Palermo v. City of Pittsburgh*, 13 A.2d 24 (Pa. 1940), a clerk challenged his removal from a civil service position. The city contended the clerk was removed because the director of public safety who certified him as eligible was not properly appointed to the director position and, therefore, lacked the authority to appoint the clerk. The director was appointed by the mayor while the city council was in recess. The Supreme Court held that regardless of whether the appointment was properly done, "[i]t cannot be disputed that [the director's] status was at least that of a *de facto* officer at the time when he appointed petitioner a clerk in the service of the [c]ity." *Id.* at 26. The Supreme Court explained:

> From an early date the appellate Courts of this Commonwealth have held steadily to the rule that the acts of public officers *de facto*, coming in by color of title (whether or not entitled *de jure*), are good so far as respects the public, but void when for their own benefit; and it is equally well settled that attacks upon the right of such incumbents to serve must be made by the [C]ommonwealth, in a direct proceeding for that purpose, and cannot be made collaterally.

*Id.* (internal quotation marks omitted).

The Supreme Court stated the clerk was fully qualified and eligible to hold the position, and "[t]he record contain[ed] no allegation that the [d]irector gained any personal advantage from the appointment." *Id.* at 27.

A few years later, the Supreme Court considered the applicability of the doctrine again. In *Borough of Pleasant Hills v. Jefferson Township*, 59 A.2d 697 (Pa. 1948), a challenge was brought to the authority of a burgess to act on behalf of a borough. The burgess was elected at a special election following the incorporation

18

of the borough. However, under the law, borough officials could not be elected until the next regular municipal election following the incorporation. *Id.* at 699. Notwithstanding the premature election, the Pennsylvania Supreme Court held that "the burgess and the councilmen who were elected at the special election and duly sworn in were at least *de facto* officers and, as such, entitled to perform the duties and exercise the powers of their respective offices." *Id.* The Supreme Court explained

> [a] person in possession of an office and discharging its duties under the color of authority—that is, authority derived from an election or appointment however irregular or informal so that the incumbent be not a mere volunteer—is a *de facto* officer, and his acts are good so far as respects the public; attacks upon the right of such incumbent to serve must be instituted by the Commonwealth in a direct proceeding for that purpose and cannot be made collaterally.

*Id.*

The Supreme Court explained the policy behind the *de facto* doctrine in its seminal case on the issue, *State Dental Council and Examining Board v. Pollock*, 318 A.2d 910 (Pa. 1974). In *Pollock*, an administrative board suspended a dentist's license for allowing a non-dentist to administer anesthesia. The dentist challenged the appointment of board members as violating the prohibition against special legislation and delegation of gubernatorial appointment power. The Commonwealth argued the board members were *de facto* officials. The Supreme Court explained

> [t]he doctrine springs from an understandable fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question. "If the question (of right to office) may be raised by one private suitor it may be raised by all, and the administration of justice would under such circumstances prove a failure." *Coyle v. Commonwealth*, 104 Pa. 117, 130 (1883). The [d]e facto doctrine seeks to protect the public by ensuring the orderly functioning of the government despite technical defects in title to office.

19

*Pollock*, 318 A.2d at 913.

From these cases, several principles become apparent. First, the *de facto* doctrine is necessary to avoid the chaos that would ensue if it was determined a public official's title was not clear due to some sort of defect in their assuming that position. *Id.*; *Raker*, 144 A. at 749. Second, the public official must have been acting under color of title, *i.e.*, the appearance of authority to act based on their position.[29] *Pleasant Hills*, 59 A.2d at 699; *Palermo*, 13 A.2d at 26; *Keyser*, 2 Rawle at 140. Third, acts for the public or a third party are valid. *Palermo*, 13 A.2d at 26; *Keyser*, 2 Rawle at 140; *Riddle*, 7 Serg. & Rawle at 392.

These cases also expound additional principles: that there cannot be knowledge of a defect in one's title and an individual cannot invoke the *de facto* doctrine for their own benefit. *Palermo*, 13 A.2d at 26; *Keyser*, 2 Rawle at 140; *Riddle*, 7 Serg. & Rawle at 392. From this, it follows that an individual cannot have acted in bad faith or with nefarious motives. *See Raker*, 144 A. at 749 (applying the *de facto* doctrine based on the trial court's findings, which were supported by substantial evidence, despite contrary evidence of "suspicious circumstances," which could have supported a finding of fraud, conspiracy, bribery, or corruption). Core5 directs the Court to cases from other jurisdictions for these propositions. However, the Court need not look that far because, as the Commonwealth's earliest jurisprudence illustrates, these requirements have already been adopted by our Supreme Court. As it stated in *Keyser*:

> **the act of an officer *de facto*, where it is for his own benefit, is void; because, he shall not take advantage of his own want of title, which**

---

[29] Black's Law Dictionary defines "color" as "[a]ppearance, guise, or semblance; esp., the appearance of a legal claim to a right, authority, or office." Black's Law Dictionary (12th ed. 2024).

20

**he must be conusant of**;[30] but where it is for the benefit of strangers, or the public, who are presumed to be ignorant of such defect of title, it is good.

2 Rawle at 140 (emphasis added). The Township and Board appear to argue that there should be blanket application of the *de facto* doctrine regardless of the circumstances. As discussed above, though, this is contrary to Pennsylvania precedent.

The Township and Board also argue the courts have routinely applied the *de facto* doctrine when challenges have been lodged to an official's authority to act and that no Pennsylvania court has ever declined to apply the *de facto* doctrine based upon knowledge or bad faith. While true, from our review of the caselaw, the situation does not appear to have ever arisen. The defects in the officials' title in our high court's precedent, set forth above, were failure to take the oath of office (*Keyser*, *Riddle*), qualification for office (*Raker*), appointment while in recess (*Palermo*), premature election (*Pleasant Hills*), and propriety of the appointment authority (*Pollock*). These defects are similar to those found in opinions by the intermediate appellate courts. For instance, in *Commonwealth v. Brownmiller*, 14 A.2d 907 (Pa. Super. 1940),[31] a criminal defendant challenged his indictment, in part, on the basis that special prosecutors who participated in the investigation and grand jury proceedings were wrongfully appointed. Specifically, it was alleged that the court that appointed the special prosecutors did not have authority to do so. The Superior Court ultimately held the appointments were proper and stated that even if

---

[30] "Conusant" is defined as "(Of a person) having cognizance or knowledge." Black's Law Dictionary (12th ed. 2024).

[31] "In general, Superior Court decisions are not binding on this Court, but they offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

21

the appointments were deficient in some way, the *de facto* doctrine applied and any acts the special prosecutors took were valid. *Id.* at 910.

Our sister court examined the doctrine again in *Commonwealth v. Pontious*, 578 A.2d 1 (Pa. Super. 1990), where a common pleas court suppressed evidence in two criminal matters on the grounds the arresting officer was hired without taking a civil service examination. In a consolidated appeal, the Superior Court reversed. It found the arrestees did not have standing to challenge the alleged wrongful hiring. *Id.* at 1. The court explained their "argument [wa]s based on the false premise that every act performed by a public official who was not properly hired is invalid." *Id.* at 3. Citing the *de facto* doctrine, it held a police officer legitimately could exercise search and seizure powers, even if the officer's hiring did not comply with the law. *Id.*

This Court has also applied the doctrine when irregularities in one's title to office occur. One of our earliest decisions was *D & B Auto Sales v. Department of State, State Board of Motor Vehicle Manufacturers, Dealers and Salesmen*, 370 A.2d 428 (Pa. Cmwlth. 1977), where a used car dealership challenged a suspension of its license, asserting the composition of the administrative board that suspended it did not comport with the law. In particular, it was alleged that two board members who were used car dealers and, thus, qualified at the time of their appointment were no longer qualified under statute because they purchased new car franchises. We held, to the extent any of the board members were no longer eligible to serve, that the "challenge falls squarely within the [*d*]*e facto* doctrine." *Id.* at 430.

More recently, in *Quest Land Development Group, LLC v. Township of Lower Heidelberg*, 971 A.2d 540 (Pa. Cmwlth. 2009), a zoning hearing board denied an application for a special exception. The applicant, in a separate action, asserted the

22

board members did not file statements of financial interests, did not take the required oath of office, and did not file a copy of that oath with the township secretary. The common pleas court concluded the *de facto* doctrine applied and, on appeal to this Court, the applicant argued the void *ab initio* doctrine should apply to the board's actions. We disagreed and determined that the common pleas court properly determined the *de facto* doctrine applied. *Id.* at 544.

We reached a similar result in *Carroll v. Bair* (Pa. Cmwlth., No. 2377 C.D. 2009, filed June 16, 2010),[32] where the appellant challenged the validity of a tax sale when the tax claim bureau's director had not taken a constitutional oath of office. We held the director was not required to take any oath, and even had the director been required to do so, under the *de facto* doctrine, the director's actions would have stood. *Id.*, slip op. at 5-6.

Shortly thereafter, we decided *Frame v. Menellen Township* (Pa. Cmwlth., No. 1921 C.D. 2009, filed August 5, 2010), where the appellant challenged his summary conviction on the basis that the code enforcement officer who issued the underlying citations did not take the oath of office until after the citations were issued. This Court concluded the "challenge to the validity of the citations issued against [the appellant] based on an irregularity or technical defect in [the code enforcement officer's] title to office is the type of collateral challenge our Supreme Court disapproved of in *Pollock* as being inimical to the orderly functioning of the government." *Id.*, slip op. at 10.

The Court most recently examined the continued vitality of the *de facto* doctrine in *In re: Application of the Humane Society of the Harrisburg Area, Inc.*,

---

[32] Unreported panel decisions of this Court may be cited for their persuasive value pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

92 A.3d 1264 (Pa. Cmwlth. 2014). There, an attorney argued the appointment of a humane society police officer was void *ab initio* because the humane officer was disqualified from the position based on a prior misdemeanor conviction. The attorney also sought to have 30 citations issued by the humane officer to his client deemed invalid. The Court ultimately determined the appointment was proper. Even had the appointment been improper, we explained that, under the *de facto* doctrine, this would not invalidate the citations issued to the attorney's client. *Id.* at 1272 n.9.[33]

None of these cases, though, involve any allegation that it was known the appointment or election was defective or that there was evidence of bad faith, ill will or motive, or that the action was taken in furtherance of one's own agenda or for one's own benefit. The closest a court has come to addressing that issue was in *Raker*, which the Supreme Court determined was not necessary given substantial evidence supported the common pleas court's contrary findings. 144 A. at 749. Here, the trial court, reasonably believing motivation and knowledge were irrelevant to whether the *de facto* doctrine applied, made no specific findings in those regards. However, the precedent of this Commonwealth illustrates they can be relevant considerations.

The trial court also expressed concern that not applying the *de facto* doctrine "would not only undo the vote on Core5's Plan, but also call into question every

---

[33] The U.S. Supreme Court has also applied the doctrine. *See McDowell v. United States*, 159 U.S. 596 (1895) (*de facto* doctrine would lend validity to actions of a district judge whose appointment was unauthorized). *But see Nguyen v. United States*, 539 U.S. 69 (2003) (*de facto* doctrine inapplicable when judge's appointment to a panel violated statutory provision, which was not a "merely technical" defect, so judgments were vacated); *Ryder v. United States*, 515 U.S. 177 (1995) (*de facto* doctrine did not apply where two civilians were appointed to the Court of Military Review in violation of the Appointments Clause, U.S. Const., Art. II, § 2, cl. 2, so judgment was reversed and the matter remanded for a new hearing before a properly-constituted court).

24

other action that [] Dietrich took from November 28, 2022[,] until the date of his ouster on June 13, 2023," and that this "would be wholly inconsistent with the purpose of the *de facto* doctrine to promote the orderly and continuous functioning of government despite technical defects in title to office." (Decision at 31.) The trial court is right that promoting the orderly and continuous functioning of government is the policy underlying the doctrine and an important consideration. But if Core5 is correct that Hughes and Dietrich knew that the appointment procedure was not being followed and that they had some ill motive, intent, or bad faith, which the trial court found some evidence that suggests they may have,[34] the *de facto* doctrine cannot be applied. Invoking the *de facto* doctrine to shield deliberate, wrongful actions does nothing to promote the orderly functioning of government and, instead, serves to undermine public confidence and trust.

We are cognizant of the practical difficulties that are created if *de facto* validity is not given to the acts of an official with defects in title and share in the concerns that invalidating **all** acts of the person taken while wrongly in that position would create chaos and uncertainty. As Pennsylvania courts have not yet had the opportunity to address a situation where an official may have known of the defect in

---

[34] For example, the trial court found Hughes emailed other Township officials shortly after the Plan was submitted, stating warehouse development within the Township should be stopped. (FOF ¶ 36.) The trial court also found that Wessner and Seymour advised Hughes of the procedure to accept a resignation and fill a vacancy, Hughes himself contacted PSATS about the procedure, and Hughes admitted to Seymour that the process she provided was "right" if he and Wessner could not agree whom to appoint. (*Id.* ¶¶ 53, 56-58.) Notwithstanding, Hughes scheduled a Vacancy Board meeting prematurely and during a period in which he knew Wessner was unavailable and told Seymour to forward resumes only to him and Betz, the Vacancy Board chair, (*Id.* ¶¶ 67, 73.) Perhaps most suggestive of knowledge is Dietrich, one month prior to expressing an interest in the vacancy, asking for advice from an attorney for a citizens' group to which Deitrich belonged, about, not just vacancy board procedures, but also about *quo warranto* actions and the *de facto* doctrine. (*Id.* ¶ 79.) The trial court stopped short, though, of making explicit findings as to knowledge, intent, or motive, concluding it did not need to do so.

25

their appointment or election or where the official privately benefits in some way or where their actions were motivated by bad faith, we look to other jurisdictions for guidance. Illinois appears to have developed a practical approach that strikes a balance between the interests of the party who suffered adverse action or harm as a result of the defect in an official's title and the interest in promoting the orderly function of government by providing finality to decisions. In *Malacina v. Cook County Sheriff's Merit Board*, 197 N.E. 3d 182 (Ill. App. Ct. 2021), a local merit board terminated a deputy sheriff after the deputy was disciplined by the sheriff. A state circuit court upheld the termination. The deputy sought reconsideration on the basis that some members of the merit board were serving unauthorized terms, which had been judicially determined in a separate action filed by someone else. The circuit court ultimately determined that the deputy's claims were barred because the deputy was not the first challenger. On appeal, the Appellate Court of Illinois affirmed. The court, however, would not limit relief to only the "first" challenger per se. It also would provide relief to any challenger who asserted the irregularity **in the proceeding before that official**. It explained:

> The *de facto* officer rule is a common law equitable doctrine that confers validity on acts performed by an official acting under the color of official title, even though it is later determined that the official's appointment to that position was legally deficient. . . . The point is to avoid the chaos that would result from countless lawsuits challenging prior actions of that official—which could number in the hundreds or thousands—once it is determined that the official's appointment was invalid. [] The need for stability and finality in governmental decisions outweighs the need to correct decisions by that (invalidly appointed) official that were issued months or even years earlier.

> But the doctrine was never intended to preclude a *timely* challenge to an official's authority; it is, instead, a defense to a collateral challenge brought *after* the official's action has been completed. . . . So if a litigant challenges that official's authority to act within that very

administrative proceeding or contemporaneously with it—that is, *before* a final decision has been rendered—the *de facto* officer doctrine has no application. . . .

*Id.* at 188 (emphasis in original). Because the deputy there only asserted the merit board's composition was flawed after the merit board issued its determination, the court held the deputy's claims were barred by the *de facto* doctrine. *Id.* It distinguished the deputy's claims from another litigant's claims, where that litigant preserved the challenge before the merit board. *Id.*

The court further explained:

that, once [a b]oard is on notice of an illegal appointment, it may not simply proceed onward as if nothing was wrong. That is, if a litigant were to challenge the qualifications of [a b]oard in a *timely* fashion— not after-the-fact but during the proceedings themselves—the law would supply that litigant a remedy.

*Id.* at 190.

The Court finds the reasoning of the Illinois court persuasive and its approach appealing but would limit its application even further to comport with the law of this Commonwealth. Whereas any party who timely asserts a challenge to an official's title, regardless of how minor or innocent the defect, can obtain relief in Illinois, consistent with Pennsylvania Supreme Court precedent we would only permit relief to a party who timely asserts a challenge to one's title based on the official's knowledge of that defect at the time the action is taken or that the official benefited in some way or acted in bad faith or with ill will or motive.[35] This approach serves to provide relief to a party that timely raises the defect and suffers harm by that

---

[35] Of course, it must be established that there was, indeed, a defect in title. Here, there was a judicial determination in the *quo warranto* action that Deitrich was not properly appointed. (FOF ¶¶ 94-95.)

27

official's actions while not upending every other action the official whose title is defective took, which would create the exact chaos about which the courts have warned and for which the doctrine was created to avoid.

Here, at the November 28, 2022 special Board meeting, counsel for Core5, prior to Hughes and Deitrich voting on the Plan, raised the very same issues in an objection to the Board that it raises now on appeal. (FOF ¶ 91.) If it is found that Hughes and Deitrich had knowledge that the appointment of Deitrich was not proper or that either of them acted with bad faith, for their own benefit, or to promote their own agenda opposing warehouses in the Township, Core5 should be entitled to relief based upon its timely objection. If it is so determined, no one else can seek to invalidate any action in which Dietrich participated during his unauthorized term (November 10, 2022, through June 13, 2023) unless that party previously asserted that Deitrich did not have authority to act before he acted.

After the objection was raised, Hughes and Dietrich requested another extension of time to review the Plan, which counsel indicated neither he nor the Core5 representative in attendance was authorized to grant. (*Id.* ¶ 92.) The Township and Board devote considerable argument in their brief asserting Core5 refused the extension because it was seeking a deemed approval. (Township and Board's Br. at 8-10.) However, the Township and Board cite no authority, nor could the Court locate any, which obligates an applicant to grant an extension of time, let alone an eighth extension of time, for something out of the applicant's control and solely the result of the Township's and Board's actions or inactions.

While the trial court made numerous findings that could demonstrate knowledge, motive, or bad faith on the part of Hughes and/or Dietrich, because it determined such considerations were not relevant to its inquiry, it stopped short of

28

making the necessary findings that would support either the applicability or inapplicability of the *de facto* doctrine. Although there are "suspicious circumstances," similar to what the Supreme Court observed in *Raker*, 144 A. at 750, we follow the Supreme Court's lead and recognize that in our appellate capacity, we are not the factfinder and are bound by the trial court's findings as they relate to facts, credibility, and weight of the evidence so long as they are supported by substantial evidence. Thus, we are constrained to vacate the trial court's Order and remand for the trial court to make additional factual findings based on the existing record. The trial court should then apply the law as set forth herein to those facts and issue a new determination as to the merits of Core5's claims.

## IV. CONCLUSION

The *de facto* doctrine has a long history of ensuring governments continue to function in an orderly fashion when someone in a position of authority is shown to wrongfully hold that position. Although the Pennsylvania courts from the earliest days of the doctrine have indicated that the acts of someone who knew of the defect, benefited from it, or acted in bad faith would be void, no court of this Commonwealth has faced that situation. Thus, it is understandable that the trial court, concluding knowledge, motivation, and bad faith were irrelevant, did not make the factual findings, resolve conflicts in the evidence, or make credibility determinations, which are necessary to determine if the *de facto* doctrine should apply here. Accordingly, we vacate the trial court's order and remand for it to make those determinations and issue a new decision on the merits.

_____
RENÉE COHN JUBELIRER, President Judge

29

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Core5 at Route 100, LLC,            :
                   Appellant      :
                                :
           v.                :     No. 57 C.D. 2025
                                :
Lowhill Township and Lowhill     :
Township Board of Supervisors   :

**O R D E R**

**NOW**, April 7, 2026, the Order of the Court of Common Pleas of Lehigh County, entered in the above-captioned matter, is **VACATED.** This matter is **REMANDED** for additional findings and a new determination, consistent with the foregoing opinion.

Jurisdiction relinquished.

 

_____
RENÉE COHN JUBELIRER, President Judge